# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 46357-1-II |
| Respondent, | |
| v. | |
| JUSTIN PURNELL MOSES, | consolidated with |
| Appellant. | |
| STATE OF WASHINGTON, | No. 46377-6-II |
| Respondent, | |
| v. | |
| AIMEE MAXINE MOSES, | PUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — Justin Purnell Moses and Aimee Maxine Moses[1] appeal their convictions of criminal mistreatment in the second degree[2] for causing substantial bodily harm by withholding the basic necessities of life from M.A.

Justin argues the trial court erred when it (1) admitted redacted versions of Aimee's interview with Detective Thomas Catey in violation of his Sixth and Fourteenth Amendment rights to confront witnesses, (2) denied his motion to sever, (3) applied the wrong legal standard in admitting the child hearsay statements under RCW 9A.44.120, (4) instructed the jurors on the

---

[1] To avoid confusion, we refer to Justin and Aimee by their first names. We intend no disrespect.

[2] RCW 9A.42.030(1)(a), or (b).

abuse of trust and particularly vulnerable victim aggravating factors and imposed an exceptional sentence on that basis. He also argues that the cumulative effect of these errors requires reversal.

Aimee joins all of Justin's arguments with the exception of issues 1 and 2. She further argues that the trial court erred when it sustained the State's objection in closing argument regarding the presumption of innocence. Justin joins Aimee's argument. We affirm.

FACTS

The State, by amended information, charged Aimee and Justin with criminal mistreatment in the second degree. The State alleged they recklessly created an imminent and substantial risk of death or great bodily harm to M.A., or in the alternative, recklessly caused substantial bodily harm by withholding the basic necessities of life from M.A., during the period between December 1, 2011 and February 27, 2012. The State charged both Aimee and Justin with three aggravating factors, including using their

> position of trust, confidence, or fiduciary responsibility to facilitate the commission of the current offense, and/or . . . [their] conduct during the commission of the current offense manifested deliberate cruelty to the victim, and/or . . . [they] knew or should have known that the victim . . . was particularly vulnerable or incapable of resistance.

Clerk's Papers (Aimee) (CP A) at 20, 21; Clerk's Papers (Justin) (CP J) at 205, 206.[3]

I. OVERVIEW

M.A., born in 2007, had issues with overeating. M.A.'s mother is related to Justin and a member of the Muckleshoot Tribe. In September 2011, the Muckleshoot Tribe's Indian Child Welfare program (ICW) removed M.A. and his sister, V.A., from their foster home and placed

---

[3] Appellants' designated separate clerk's papers (CP) to this court. We reference Aimee's designated CPs as CP A and Justin's designated CPs as CP J.

them with Justin and Aimee because they were family. M.A. and V.A. lived with Justin, Aimee, and their two children.

In late September 2011, M.A. enrolled in Daffodil Elementary School's Early Childhood Education and Assistance Program. Aimee told the school's family support specialist, Vicki Jones, that they were addressing M.A.'s eating issues, which included him eating chicken bones. Aimee told Jones that she was trying to get M.A. a medical appointment for a well-child exam with the tribe. In early October, the school completed M.A.'s health screening.

After Christmas break, M.A. stopped attending school. The school called Aimee, who said she sprained her foot and was unable to take M.A. to school. When M.A. returned to school on January 9, 2012, he appeared thinner to school employees. They weighed him and he was 8 pounds lighter than his initial weigh-in approximately 3 months earlier. Concerned, the school called Aimee. She said that M.A. was sick the week before, but she fed him PediaSure® to make sure he received proper nutrition.

A few days later, Aimee told Jones that M.A. should only eat one serving of food and only drink half a cup of water at each meal because he had a tear in his esophagus that existed before he came to live with them. M.A. did not attend school again. On January 23, 2012, Jones called Aimee again regarding M.A.'s attendance; Aimee said they were having transportation problems. The school continued to call the Moseses and leave messages inquiring about M.A.

On February 27, 2012, M.A.'s case worker, Debbie Guerrero, called Claire O'Brien, M.A.'s teacher. After the conversation, Guerrero called the Moseses and asked Justin to bring M.A. to the ICW office for a visit. Later that day, Justin brought M.A. into the office. The staff was shocked at M.A.'s emaciated appearance. Justin seemed unfazed and did not react to the

concerns the staff expressed; he did not have answers to any questions the staff asked about MA's health.

The ICW staff called an ambulance to transport M.A. to Mary Bridge Children's Hospital for treatment. Mary Bridge admitted M.A. for severe malnourishment. M.A.'s tribal case workers told one of M.A.'s doctors that they did not recognize M.A. because he had such a drastic weight loss.

Cornelia Thomas, a child forensic interviewer, interviewed M.A. in the hospital with Detective Catey and Sergeant Berg present. M.A. told Thomas that he did not go to school. When he did attend, Aimee drove him and he ate lunch at school. M.A. said that Aimee would make dinner, he would eat jalapenos and hot sauce all the time, but he did not like them. He said that he had to eat the jalapenos and hot sauce even though the food would make him cry because Aimee would spank him if he did not eat it. M.A. said Justin and Aimee would tell him to stop crying. He denied that others ate hot sauce or jalapenos, except Justin.

M.A. remained hospitalized for approximately eight days. After his release, ICW placed M.A. in an emergency foster home with his sister.

A few weeks after his release, Thomas interviewed M.A. again. In this interview, M.A. told Thomas he was locked in his room behind a gate. If he got out from behind the gate, Aimee would spank him. M.A. denied sneaking food. He told Thomas that he did eat breakfast at Aimee's house, but not lunch, and only a little food. He said Aimee and Justin gave him the jalapenos and hot sauce. He said he would eat Indian tacos, but only he and Justin ate them with jalapenos. He told Thomas that he did not want the jalapenos, but Justin and Aimee made him eat them.

On May 24, 2012, Detective Catey and Detective Darren Moss interviewed Aimee and Justin in a joint interview at their home. Detective Catey advised them both of their *Miranda*[4] rights, they each signed a waiver of their rights, and they both answered questions. Aimee spoke throughout most of the interview and Justin's answers were minimal. Aimee told Detective Catey that the school allowed M.A. to eat off the floor. She said M.A. always wanted jalapenos. She denied telling anyone M.A. had an issue with his esophagus. Justin said that when he brought M.A. to ICW he was fine, and he did not notice any significant change. Aimee and Justin both denied restricting M.A.'s food.

II.     PROCEDURAL HISTORY

A.     Pre-Trial Motions

The State provided notice that it intended to introduce hearsay statements of M.A. at trial. Both Justin and Aimee filed motions to exclude any child hearsay statements because there was no physical abuse or substantial bodily harm present in the case. The trial court heard the motions. The State argued that the statements fell within the child hearsay statute[5] because withholding food and nutrition from a child that results in substantial bodily harm is an act of physical abuse.

The trial court relied on Black's Law Dictionary for definitions and reasoned that the trial court give words their ordinary and intended meaning. The trial court read the definition for

> "abused and neglected children." And it says, "Those that are suffering serious physical, emotional injury inflicted on them including malnutrition. See abuse, female child or child abuse." So then that includes malnutrition. Under child abuse it says, "Any form of cruelty to a child's physical, moral or mental well being."

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[5] RCW 9A.44.120: "A statement made by a child when under the age of ten . . . describing any act of physical abuse of the child by another that results in substantial bodily harm . . . not otherwise admissible by statute or court rule, is admissible in evidence in . . . criminal proceedings" after a hearing.

Report of Proceedings (RP) (Feb. 24, 2014) at 49. The trial court preliminarily determined that Washington's statute on child hearsay statements applied to the behavior that resulted in M.A.'s malnutrition. However, it reserved making a ruling.

Both Justin and Aimee filed motions to sever their trials based on the marital privilege. They argued that in a joint trial, one spouse could deny the other the right to testify. They also moved to exclude statements they made to the police because the admission of their statements would violate the confrontation clause under *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). During a CrR 3.5 hearing, the trial court determined that the statements, with redactions, would be admissible because the interview was not custodial. The court did not rule on the confrontation issue at this time. Subsequently, Justin filed a brief in support of his motion to sever the trial. He argued that Detective Catey's interview of Aimee and Justin could not be redacted in any meaningful way and that Justin's silence should not be considered an adoptive admission.[6]

Aimee made a motion to exclude child hearsay and argued the statements violated the confrontation clause because they were testimonial in nature, even if they were generally admissible under RCW 9A.44.120. After the State provided its proposed redacted transcripts of Aimee and Justin's interview, Aimee renewed her motion to sever. The trial court denied the motions to sever.

The trial court held a hearing on Aimee's and Justin's motions to exclude child hearsay statements. Following its earlier reasoning, the trial court stated that the ordinary meaning of "physical" and "abuse" would include maltreatment that results in malnutrition and the meaning of "physical abuse" encompassed this concept as the term was used in the child hearsay statute.

---

[6] ER 801(d)(2)(ii).

The trial court again reserved ruling on the child hearsay issue until trial. But, after hearing M.A.'s testimony, it found that M.A. was competent to testify and the statements would be admissible as long as M.A. testified at trial and was subject to cross-examination.

The trial court analyzed the reliability of the child hearsay statements under the *Ryan*[7] factors. The trial court found that M.A.'s statements were reliable because he had no motive to lie, the statements were spontaneous because they were not in response to leading questions, the timing of the statements were not too long after the events, M.A. seemed to have a good memory, and the circumstances surrounding the statements were appropriate in that M.A. had the ability to receive information, make a memory of the information, and then relate it later.

B.      Trial Testimony

At trial, M.A. testified as follows. He was kept in his room by a baby gate and if he left his room, Justin and Aimee would "whoop" his bottom. RP (May 1, 2014) at 1027. He ate hot sauce and jalapenos for dinner and did not like them. Only Justin and M.A. ate jalapenos. M.A. only drank a little bit of water and did not drink any other beverages. Aimee never took him to the doctor. M.A. said he was skinny "[b]ecause I was starved. . . . I didn't get any food." RP (May 1, 2014) at 1023. He did not like living with Aimee and Justin because "[t]hey starved [him]." RP (May 1, 2014) at 1025.

Mary Bridge admitted M.A. for treatment because he was severely malnourished. While in the hospital, M.A.'s weight was around the tenth or fifth percentile, and the hospital ruled out medical causes of the malnourishment. His resident doctor, Dr. Daniel Krebs, described M.A. as having sunken eyes, "you could see his ribs mo[r]e so than you would even on a normally skinny

---

[7] *State v. Ryan*, 103 Wn.2d 165, 691 P.2d 197 (1984).

child," and he was unable to hop on one foot; "[h]e seemed weak."[8] RP (May 1, 2014) at 933. When he arrived at the hospital, M.A. weighed 33 pounds and was three feet, four inches tall. He had a great deal of lower extremity muscle atrophy, described as cachectic or "wasting away." RP (May 1, 2014) at 937. His skin was "doughy" and "tented" when pulled which is a sign of dehydration and malnutrition. RP (May 1, 2014) at 937. Dr. Krebs planned to refeed M.A., but he worried that M.A. would be subject to "refeeding syndrome," where the body has dangerous disturbances in its electrolytes when it finally receives food after a long period of no food. RP (May 1, 2014) at 940-41. Dr. Krebs acknowledged that M.A. had a normal white blood cell count, normal temperature, but low protein and a protuberant belly—other signs of malnutrition.

The trial court admitted M.A.'s statements to Thomas at trial. Over defense objections, the trial court also admitted redacted versions of Aimee's and Justin's statements to Detective Catey. The redacted version of the interview included statements by Aimee where she used the words "we" and "us;" references to Justin were replaced with "his." The trial court instructed the jury not to consider the statements made by Aimee in deciding Justin's case.

C.      Trial Motions, Jury Instructions, Closing Arguments, Verdicts, and Sentencings

Justin and Aimee moved to strike the aggravating factors related to the abuse of a position of trust and the particular vulnerability of the victim because they were already encompassed within the crime of criminal mistreatment. They moved to strike the third aggravating factor based on insufficient evidence to prove deliberate cruelty. The trial court denied the motions.

---

[8] M.A.'s doctor also testified that sunken eyes implied a loss of muscle mass in your face and can also be a sign of dehydration. He testified that having a patient hop on one foot was something he learned while working with a pediatrician in Africa with malnourished children; it is a way of assessing normal muscle mass.

After the State rested its case, Aimee and Justin again made severance motions.  The trial court denied them.  Neither Aimee nor Justin testified at trial.

During closing argument, Justin's counsel argued, "I would contend that being thin is not the same as substantial disfigurement especially when you're told, analyze the evidence while presuming their innocence."  RP (May 13, 2014) at 1987.  The State objected on the grounds that the argument misstated the law; the trial court sustained the objection.  In rebuttal, the State argued that the presumption of innocence means "[t]hey are innocent up to and unless you find that the State has overcome its burden and proven that they are guilty of a crime."  RP (May 13, 2014) at 1994.

The trial court instructed the jury on the presumption of innocence: "A defendant is presumed innocent. This presumption continues throughout the entire trial unless during your deliberations you find it has been overcome by the evidence beyond a reasonable doubt."  CP A at 73 (Instr. 3); CP J at 241 (Instr. 3).  In addition, the trial court instructed the jury:

> You may only consider statements made by defendant Aimee Moses as evidence when determining whether the State has proven Aimee Moses committed a crime.  You may not consider statements made by defendant Justin Moses when determining whether Aimee Moses committed a crime.
> You may only consider statements made by defendant Justin Moses as evidence when determining whether the State has proven Justin Moses committed a crime.  You may not consider statements made by Aimee Moses as evidence when determining whether Justin Moses committed a crime.

CP A at 77 (Instr. 7); CP J at 245 (Instr. 7).

The trial court instructed the jury on aggravating factors for both Aimee and Justin.  For the particularly vulnerable victim aggravator, the court instructed the jury that "a victim is 'particularly vulnerable' if he or she is more vulnerable to the commission of the crime than the typical victim of criminal mistreatment in the second degree.  The victim's vulnerability must also

be a substantial factor in the commission of the crime." CP A at 106 (Instr. 36); CP J at 274 (Instr. 36). The trial court instructed the jury on the abuse of trust aggravating factor:

> A defendant uses a position of trust to facilitate a crime when the defendant gains access to the victim of the offense because of the trust relationship. A defendant need not personally be present during the commission of the crime, if the defendant used a position of trust to facilitate the commission of the crime by others.
>
> In determining whether there was a position of trust, you should consider the length of the relationship between the defendant and the victim, the nature of the defendant's relationship to the victim, and the vulnerability of the victim because of age or other circumstance.
>
> There need not be a personal relationship of trust between the defendant and the victim. It is sufficient if a relationship of trust existed between the defendant and someone who entrusted the victim to the defendant's care.

CP A at 107 (Instr. 37); CP J at 275 (Instr. 37).

The jury found both Aimee and Justin guilty of criminal mistreatment in the second degree by causing substantial bodily harm by withholding basic necessities of life. It also found Aimee guilty of all three charged aggravating factors, and Justin guilty of two.

The trial court sentenced Aimee to an exceptional sentence of 60 months of confinement. The trial court entered findings of fact and conclusions of law for Aimee's exceptional sentence: Aimee's conduct manifested deliberate cruelty, she knew or should have known M.A. was particularly vulnerable or incapable of resistance, and she used her position of trust or confidence to facilitate the commission of the crime. The trial court found that these substantial and compelling reasons justified the exceptional sentence.

The trial court sentenced Justin to an exceptional sentence of 40 months of confinement. The trial court entered findings of fact and conclusions of law for Justin's exceptional sentence: Justin knew or should have known M.A. was particularly vulnerable or incapable of resistance,

and he used his position of trust or confidence to facilitate the commission of the crime. The trial court found that these substantial and compelling reasons justified the exceptional sentence.

Aimee and Justin appeal.

## ANALYSIS

I.    ADMISSION OF REDACTED VERSION OF AIMEE'S INTERVIEW WITH DETECTIVE CATEY

Justin argues that the trial court erred in admitting Aimee's interview with Detective Catey because the interview contained testimonial hearsay and violated his Sixth and Fourteenth Amendment rights to confront witnesses.[9] He argues that the statements inculpate him because the use of plural pronouns like "we," "us," and "our" refer to him and Aimee and their joint role as M.A.'s caretakers. We disagree.

A.    Standard of Review

We review alleged violations of the Confrontation Clause de novo. *United States v. Mayfield*, 189 F.3d 895, 899 (9th Cir. 1999); *United States v. Hoac*, 990 F.2d 1099, 1105 (9th Cir. 1993).

The Sixth Amendment to the United States Constitution states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Under the confrontation clause, out-of-court testimonial statements by witnesses are barred unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the witnesses. *Crawford*, 541 U.S. at 54-55.

---

[9] Justin makes no separate legal argument relating to the Fourteenth Amendment; therefore, our analysis is on the Sixth Amendment.

11

B.      No Confrontation Clause Violation

"[T]he United States Supreme Court held that the defendant was deprived of his confrontation rights under the Sixth Amendment when he was incriminated by a pretrial statement of a codefendant who did not take the stand at trial." *State v. Hoffman*, 116 Wn.2d 51, 75, 804 P.2d 577 (1991) (citing *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d. 476 (1968)). But in *Richardson v. Marsh*, 481 U.S. 200, 208, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987), the United States Supreme Court held that a confession redacted to omit all reference to the codefendant fell outside *Bruton*'s prohibition because the statement was "not incriminating on its face" and became incriminating "only when linked with evidence introduced later at trial (the defendant's own testimony)."

*Bruton* applies to inculpatory statements. 391 U.S. at 135-36. The *Bruton* Court recognized the "powerfully incriminating" effect of the extrajudicial statements of a codefendant "who stands accused side-by-side with the defendant." 391 U.S. at 135-36. Not only are the statements "devastating to the defendant, but their credibility is inevitably suspect." *Bruton*, 391 U.S. at 135-36. Statements that do not incriminate a codefendant are not subject to the *Bruton* rule. *State v. Dent*, 123 Wn.2d 467, 487, 869 P.2d 392 (1994).

We have stated that a non-testifying codefendant's statement violates the confrontation clause unless certain criteria are met when redacting the statement. *State v. Larry*, 108 Wn. App. 894, 905, 34 P.3d 241 (2001). To fall outside the prohibition, "[r]edacted statements must be (1) facially neutral, i.e., not identify the nontestifying defendant by name (*Bruton*[, 391 U.S. 123]); (2) free of obvious deletions such as 'blanks' or 'X' (*Gray* [*v. Maryland*, 523 U.S. 185, 118 S. Ct.1151, 140 L. Ed. 2d 294 (1998)]); and (3) accompanied by a limiting instruction (*Richardson*[, 481 U.S. 200])." *Larry*, 108 Wn. App. at 905.

Justin only challenged a few specific statements in his brief. We need not consider the other instances from the interview because he did not properly raise them. RAP 10.3(a)(6).[10] In reviewing the specific instances Justin cited in his brief, the use of the plural pronouns does not involve inculpatory statements. For instance, Justin referenced a question by Detective Catey that referred to both Justin and Aimee: "'And when were they placed here with you?'" Br. of Appellant at 9 (quoting Ex. 74). This question would not and did not provoke an incriminating response. Many instances of the plural pronouns did not just refer to Justin and Aimee, but to the family as a whole. For instance, another question by Detective Catey referred to the entire family and not just Justin and Aimee: "'Would the whole family eat together?'" Br. of Appellant at 9 (quoting Ex. 74). Again, this question did not produce any inculpatory statements: Aimee responded "Um-hm." Ex. 74. Another example: "We all have dinner at the same time" and "when he moved in with us, he was eating healthier." Ex. 74. Eating together as a family is not inculpatory. Justin also challenged both Detective Catey's and Aimee's use of the word "here" to refer to the Moses's household. Br. of Appellant at 10. Again, this information is not inculpatory and not prejudicial.

---

[10] Justin generally argues that throughout the interview, the plural pronouns used, e.g. "we," "us," and "our" refer to him and Aimee. Except for a few examples, he does not cite to the specific parts of the record he challenges. It is Justin's obligation to point to the specific parts of the record he claims constitutes error. RAP 10.3(a)(6). "Without adequate, cogent argument and briefing, [we will] not consider an issue on appeal." *Schmidt v. Cornerstone Invs., Inc.*, 115 Wn.2d 148, 160, 795 P.2d 1143 (1990). Although appellate courts are not in business of searching the record to discover the alleged deficiencies to which challenger may be referring, we have reviewed the entire transcript. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 819, 828 P.2d 549 (1992). Because our independent review of the record shows that not all of the plural pronouns specified by Justin refer only to him and Aimee, we confine our decision to those few examples Justin raised that cite to the record.

13

Here, the redacted statements met the three criteria to fall outside the prohibition. First, these statements were facially neutral in that none referred to Justin by name, and the plural pronouns used in context could have referred to other members of the Moses family. Second, the redactions did not leave obvious deletions. Third, the jury was instructed only to use Aimee's interview statements when considering the evidence against her, not against Justin. The trial court specifically instructed the jury before the audio of the interview was played and again in instructing the jury that they were "only [to] consider statements made by a defendant when evaluating the evidence against that individual defendant." RP (May 7, 2014) at 1595.

This case is analogous to *Richardson*, 481 U.S. 200, because the jury could likely surmise that certain parts of Aimee's interview referenced Justin when combined with other evidence introduced at trial, particularly that they were a married couple on trial as codefendants. We hold that the statements made by Aimee were not facially incriminating of Justin because her statements were a general denial of the abuse, and therefore, redactions of the statements were proper and alleviated any confrontation clause issues.

The admission of Aimee's redacted statement did not violate Justin's Sixth or Fourteenth Amendment rights under the confrontation clause because the statements were not inculpatory, they were properly redacted, and the trial court instructed the jury not to consider Aimee's statements when considering Justin's charges.

II. MOTIONS TO SEVER

Justin argues that the trial court erred in denying his motions to sever because redacting Aimee's portion of their joint interview with Detective Catey did not eliminate all prejudice to him when it was admitted at trial against Aimee. We disagree.

14

A.      Standard of Review

Separate trials are not favored in this State.  *Dent*, 123 Wn.2d at 484; *State v. Campbell*, 78 Wn. App. 813, 819, 901 P.2d 1050 (1995).  "Severance of trials is also discretionary with the trial court."  *Larry*, 108 Wn. App. at 911.  We review a trial court's decision on a motion for severance under CrR 4.4(c) for a manifest abuse of discretion.  *State v. Rodriguez*, 163 Wn. App. 215, 228, 259 P.3d 1145 (2011).  The defendant "must be able to point to specific prejudice" to support a claim that the trial court abused its discretion.[11]  *State v. Wood*, 94 Wn. App. 94 Wn. App. 636, 641, 972 P.2d 552 (1999).  "Defendants seeking severance have the burden of demonstrating that a trial involving both counts would be so manifestly prejudicial as to outweigh the concern for judicial economy."  *State v. Bythrow*, 114 Wn.2d 713, 718, 790 P.2d 154 (1990).  Severance and joinder are analyzed in the same manner.  *State v. Embry*, 171 Wn. App. 714, 731, 287 P.3d 648 (2012).

Specific prejudice may be demonstrated by showing:

> "(1) antagonistic defenses conflicting to the point of being irreconcilable and mutually exclusive; (2) a massive and complex quantity of evidence making it almost impossible for the jury to separate evidence as it related to each defendant when determining each defendant's innocence or guilt; (3) a co-defendant's statement inculpating the moving defendant; (4) or gross disparity in the weight of the evidence against the defendants."

*State v. Canedo-Astorga*, 79 Wn. App. 518, 528, 903 P.2d 500 (1995) (quoting *United States v. Oglesby*, 764 F.2d 1273, 1276 (7th Cir. 1985)) (citations omitted).

---

[11] In so far as Justin is arguing the failure to sever violated his right to confront witnesses, we have addressed that issue in a previous section.

B.      The Trial Court Did Not Abuse Its Discretion

"[A] motion to sever under CrR 4.4(b) addresses the issue of prejudice to the defendant notwithstanding proper joinder." *State v. Gatalski*, 40 Wn. App. 601, 606, 699 P.2d 804 (1985) (footnote omitted).  CrR 4.4(c), states in pertinent part:

> (1) A defendant's motion for severance on the ground that an out-of-court statement of a codefendant referring to him is inadmissible against him shall be granted unless: . . .
>       (ii) deletion of all references to the moving defendant will eliminate any prejudice to him from the admission of the statement.

Defendants may be joined for trial, "[w]hen each of the defendants is charged with accountability for each offense included."  CrR 4.3(b)(1).  Here, the charges against Justin and Aimee were connected in time, place, and occasion.  The cross-admissibility of the evidence supports their joint trial.

When Justin made his motions to sever, the trial court properly analyzed the issues, took appropriate steps to ensure fairness at trial, and instructed the jury to not consider Aimee's statements against Justin.  Justin has failed to demonstrate any specific prejudice.  The trial court did not abuse its discretion in denying the motion to sever.

III.    ADMISSION OF CHILD HEARSAY

Justin and Aimee argue that the trial court erred by admitting child hearsay because the legislature did not intend RCW 9A.44.120 to apply to this type of criminal mistreatment case.  We disagree.

A.      Standard of Review

"Statutory interpretation involves questions of law that we review de novo."  *State v. Jacobs*, 154 Wn.2d 596, 600, 115 P.3d 281 (2005).  "In construing a statute, the court's objective is to determine the legislature's intent."  *Jacobs*, 154 Wn.2d at 600.  "'[I]f the statute's meaning is

plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent.'" *Jacobs*, 154 Wn.2d at 600 (quoting *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002)). "'[W]e may discern the plain meaning of nontechnical statutory terms from their dictionary definitions.'" *State v. Kintz*, 169 Wn.2d 537, 547, 238 P.3d 470 (2010) (quoting *State v. Cooper*, 156 Wn.2d 475, 480, 128 P.3d 1234 (2006)). We review the trial court's decision to admit child hearsay evidence for an abuse of discretion. *State v. Borboa*, 157 Wn.2d 108, 121, 135 P.3d 469 (2006). "A trial court abuses its discretion 'only when its decision is manifestly unreasonable or is based on untenable reasons or grounds.'" *Borboa*, 157 Wn.2d at 121 (quoting *State v. C.J.*, 148 Wn.2d 672, 686, 63 P.3d 765 (2003)).

Hearsay statements of a child under the age of ten are admissible in a criminal case when the statements describe sexual or physical abuse of the child, the court finds that the time, content, and circumstances of the statements provide sufficient indicia of reliability, and the child testifies at the proceedings. RCW 9A.44.120. When determining the reliability of child hearsay, the trial court considers nine factors. *State v. Ryan*, 103 Wn.2d 165, 175-76, 691 P.2d 197 (1984).

B.    The Trial Court Properly Interpreted RCW 9A.44.120

After a hearing, the trial court admitted the child hearsay evidence on tenable grounds. It properly applied the *Ryan* factors. Nobody contests this aspect. Rather, Justin and Aimee contest whether the statute permits the admission of child hearsay in this type of criminal mistreatment case.

RCW 9A.44.120 provides in pertinent part:

A statement made by a child when under the age of ten . . . *describing any act of physical abuse of the child by another that results in substantial bodily harm as defined by RCW 9A.04.110*, not otherwise admissible by statute or court rule, is admissible in evidence in . . . criminal proceedings.

(Emphasis added.).

17

RCW 9A.44.120 allows for the admission of statements that describe physical abuse. The issue in this case is whether the neglect of a child by withholding food and through other means constitutes an "act of physical abuse." *See* RCW 9A.44.120. Our legislature has defined "acted" to include "omitted to act." RCW 9A.04.110(1). It further defined an "omission" as a "failure to act." RCW 9A.04.110(14) In addition, Black's Law Dictionary defines "abuse" as "physical or mental maltreatment, often resulting in mental, emotional, sexual, or physical injury." BLACK'S LAW DICTIONARY 12 (10th ed. 2014).

The legislature did not require an "affirmative" act, just any act that would cause substantial bodily harm. *See* RCW 9A.04.110(1), (4)(b). An act of maltreatment that leads to malnourishment, like the withholding of food, could satisfy the requirement because it is a physical omission. These definitions clearly demonstrate that the failure to provide food, sustenance, and care to a child are acts of physical abuse. Because these acts fall within the meaning of RCW 9A.44.120, the trial court properly interpreted the statute and did not abuse its discretion by admitting the child hearsay statements.

IV.     SUSTAINING STATE'S OBJECTION REGARDING THE PRESUMPTION OF INNOCENCE

Justin and Aimee argue that the trial court violated their right to the presumption of innocence when it sustained the State's objection during closing arguments to defense counsel's presumption of innocence argument. We disagree.

A ruling on an objection during closing argument is an instructional error based on a legal ruling that we review de novo. *State v. Brett*, 126 Wn.2d 136, 171, 892 P.2d 29 (1995). Jurors are presumed to follow the court's instructions. *State v. Kalebaugh*, 183 Wn.2d 578, 586, 355 P.3d 253 (2015). "Instructions must convey to the jury that the State bears the burden of proving every essential element of a criminal offense beyond a reasonable doubt. *State v. Bennett*, 161 Wn.2d

18

303, 307, 165 P.3d 1241 (2007). "[J]ury instructions must define reasonable doubt and clearly communicate that the State carries the burden of proof." *Bennett*, 161 Wn.2d at 307.

The presumption of innocence is the "bedrock upon which the criminal justice system stands." *Bennett*, 161 Wn.2d at 315. "The presumption of innocence does not stop at the beginning of deliberations; rather, it persists until the jury, after considering all the evidence and the instructions, is satisfied the State has proved the charged crime beyond a reasonable doubt." *State v. Evans*, 163 Wn. App. 635, 643, 260 P.3d 934 (2011).

Aimee and Justin argue that when the trial court sustained the prosecution's objection in the following exchange, it violated their presumption of innocence.

> [DEFENSE COUNSEL]: So then you next come to was there substantial bodily harm, and "substantial bodily harm" is defined in Instruction No. 26 and talks about substantial disfigurement, and I would contend that being thin is not the same as substantial disfigurement especially when you're told, analyze the evidence while presuming their innocence. So take the assumption that thin and—
> [THE STATE]: Objection. That's a misstatement of the law.
> [THE COURT]: Sustained.

RP (May 13, 2014) at 1987.

The State argues that the presumption of innocence has no bearing on the legal or factual issue of what constitutes "substantial disfigurement." Br. of Resp't at 22. We agree. The trial court's legal ruling on the objection did not violate the presumption of innocence.

We also note that the court's instructions to the jury correctly instructed it on the presumption of innocence: "A defendant is presumed innocent. This presumption continues throughout the entire trial unless during your deliberations you find it has been overcome by the evidence beyond a reasonable doubt." CP A at 73 (Instr. 3); CP J at 241 (Instr. 3).

The trial court did not err.

19

V.      AGGRAVATING FACTORS

The jury found beyond a reasonable doubt that both Aimee and Justin knew or should have known that M.A. was particularly vulnerable or incapable of resistance. Justin and Aimee argue that insufficient evidence existed to support this finding. We disagree.

A.      Standard of Review

Washington courts may impose exceptional sentences outside the standard range if "there are substantial and compelling reasons justifying an exceptional sentence." RCW 9.94A.535. Whenever an exceptional sentence is imposed, the court must state its reasons in written findings of fact and conclusions of law. RCW 9.94A.535.

> To reverse a sentence which is outside the standard sentence range, the reviewing court must find: (a) Either that the reasons supplied by the sentencing court are not supported by the record which was before the judge or that those reasons do not justify a sentence outside the standard sentence range for that offense; or (b) that the sentence imposed was clearly excessive or clearly too lenient.

RCW 9.94A.585(4).

Where the reviewing court is satisfied that the trial court would have imposed the same sentence based upon one valid factor, it may uphold the exceptional sentence rather than remanding for resentencing. *State v. Jackson*, 150 Wn.2d 251, 276, 76 P.3d 217 (2003). This rule is particularly appropriate when the trial court expressly states that the same exceptional sentence would be imposed based on any one of the aggravating factors standing alone. *See State v. Nysta*, 168 Wn. App. 30, 54, 275 P.3d 1162 (2012).

The trial court's written findings from Aimee and Justin's sentencing stated that it would have sentenced them both the same way even if the jury had only found one of the aggravating factors. Therefore, we need only determine if substantial evidence supports one of the factors and whether it justifies a sentence outside the standard range. *Jackson*, 150 Wn.2d at 276.

**B.      Sufficient Evidence Supports Aggravating Factor of Particularly Vulnerable Victim**

> The facts supporting an aggravating factor must be proved to a jury beyond a reasonable doubt. We use the same standard of review for the sufficiency of the evidence of an aggravating factor as we do for the sufficiency of the evidence of the elements of a crime. Under this standard, we review the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the presence of the aggravating circumstances beyond a reasonable doubt.

*State v. Zigan*, 166 Wn. App. 597, 601-02, 270 P.3d 625 (2012) (statute omitted) (citation omitted).

"In order for the victim's vulnerability to justify an exceptional sentence, the State must show (1) that the defendant knew or should have known (2) of the victim's *particular* vulnerability and (3) that vulnerability must have been a substantial factor in the commission of the crime." *State v. Suleiman*, 158 Wn.2d 280, 291-92, 143 P.3d 795 (2006) (emphasis in original).

M.A. was a five-year-old boy, who was completely dependent upon Aimee and Justin to care for him, feed him, and assist in his education and growth. He could not attend school if not taken there. M.A. went to live with Aimee and Justin after begin removed from a prior foster placement. He could not live on his own. He was particularly vulnerable because of his needs. A reasonable jury, when viewing the evidence in the light most favorable to the State, could find beyond a reasonable doubt the aggravating factor of particular vulnerability.[12]

**VI.      CUMULATIVE EFFECT OF ERRORS**

Justin and Aimee argue that the combined effect of errors at trial was prejudicial, and therefore, requires a new trial. We disagree.

---

[12] Because of this decision, we need not address the other aggravating factors. The trial court found it would have imposed the same sentence even if only one aggravating factor existed.

21

The defendant bears the burden of proving an accumulation of error of sufficient magnitude that retrial is necessary. *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 332, 868 P.2d 835 (1994). Where no prejudicial error is shown to have occurred, cumulative error cannot be said to have deprived the defendant of a fair trial. *State v. Stevens*, 58 Wn. App. 478, 498, 794 P.2d 38 (1990). Aimee and Justin's claim of cumulative error fails.

VII.     APPELLATE COSTS

Aimee and Justin have filed a supplemental brief raising the issue of whether or not they should be held responsible for paying appellate costs. Because the State's time for filing a cost bill with us and serving a copy on the parties has not passed pursuant to RAP 14.4, we decline to decide this issue at this time. If the State does request appellate costs, we will address the issue after that occurs.

We affirm.

_____
Melnick, J.

We concur:

_____
Bjorgen, C.J.

_____
Maxa, J.