IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 79790-5-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT LEE WILLIS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |
| | ) | |

VERELLEN, J. — A jury convicted Robert Willis of burglary in the first degree following a joint trial with his codefendant, Jonathan Key. Willis argues the trial court excluded evidence critical to his defense and abused its discretion by denying a motion to sever the trials. He also claims defense counsel's representation was constitutionally inadequate and challenges imposition of community supervision fees as a condition of sentence. We affirm Willis's conviction but remand for the court to strike the provision imposing costs of supervision.

FACTS

According to the testimony presented at trial, in August 2018, Tom Dykstra left his Bellevue, Washington home for a vacation in Hawaii. Before leaving,

Dykstra informed his neighbors, Guang "Allen" Wang and Peichun Tsai, that he would be out of town.

On August 18, 2018, a Saturday afternoon, the neighbors heard noises coming from Dykstra's condominium. Wang went to investigate, found the front door ajar, and heard sounds coming from upstairs. Wang called out, and two black men rushed down the stairs toward the door. Wang tried to close the door to stop the men, but one of the men hit him, knocking off his glasses. Since he cannot see well without his glasses, Wang could not identify either of the men but said one of them was wearing a "red hood."[1]

Tsai followed Wang next door and observed the two men running from Dykstra's home toward a red vehicle. The men almost ran into her, and she fell to the ground. The men sped away in the vehicle and left the development. Another neighbor who heard Wang yelling called 911.

Dykstra returned early from his vacation to find the front door damaged, the home ransacked, and several items, mostly jewelry, missing. One of the missing items was a plain 14-carat gold band worth approximately $65.

City of Bellevue police officers interviewed the neighbors and obtained surveillance video footage from one neighbor and the homeowners' association. From the video footage, police were able to identify the license plate number of the red vehicle. Detective Jeff Christiansen located the vehicle, a Chevy Impala, at an impound lot. The detective obtained a warrant to search the vehicle for

---

[1] Report of Proceedings (RP) (Mar. 20, 2019) at 459.

fingerprints. That search revealed fingerprints on a document inside the vehicle that matched an individual named Cornell Burr. The detective then obtained a warrant for Burr's telephone records.

The detective also consulted a website, Leads Online, where pawnshops are required by law to record transactions. He determined that a certain telephone number recorded as an incoming call on Burr's telephone two hours before the burglary was also associated with a transaction at a pawnshop in south Seattle an hour and a half after the burglary. The name on the pawnshop receipt was Jonathan Key.

Video surveillance footage from the Cash America pawnshop showed a red Chevrolet Impala pulled into the parking lot and two men got out of the vehicle and entered the store. Video footage from inside the pawnshop showed two men conducting a transaction, one of whom was wearing a red t-shirt with a prominent Nike logo. The detective showed a photograph of the pawned item, a plain gold band, to Dykstra, who believed the ring was his.

The detective obtained a warrant for Key's cellphone records and location data. According to those records, at the approximate time of the burglary, the phone was located in the southeastern corner of the condominium development where Dykstra lived. Then at 5:58 p.m., the same time the video footage showed the Impala and two individuals in the pawn shop, the phone was in the immediate vicinity of the Cash America pawnshop.

Willis was present when police officers arrested Key about a month after the burglary. At the time of his arrest, Willis told Christiansen that on August 18, he was at his girlfriend's apartment in Seattle and then drove to the Cash America pawnshop in the Impala at about 5:30 p.m.[2] Willis explained that a friend from high school worked there. After Willis signed a written statement to this effect, the detective said he believed Willis was involved in the burglary and asked him why he chose to go to Bellevue. Willis responded that he did not know. The detective asked for details about the burglary, and Willis denied assaulting anyone. When Christiansen asked what happened to the rest of the jewelry, Willis again said he did not know. Police officers obtained a warrant to search Key's apartment and found a red t-shirt in a laundry hamper that appeared to be the same shirt depicted in the pawnshop surveillance footage.

The State charged Key and Willis with burglary in the first degree and trafficking in stolen property in the first degree. Following a CrR 3.5 pretrial hearing, the trial court admitted Willis's oral and written statements. Several witnesses testified at Key and Willis's joint trial, including Dykstra, neighbors, and police officers. Christiansen testified about Willis's statements without objection. Neither Key nor Willis testified. The jury convicted both defendants of burglary in

---

[2] Police officers did not arrest Willis in connection with the burglary but rather because he had an outstanding warrant. The jury did not hear any evidence about the basis for Willis's arrest.

the first degree, but was unable to reach a verdict on the trafficking counts.[3] The court imposed standard range sentences. Willis appeals.

ANALYSIS

Evidence Related to an Initial Suspect

Willis argues the trial court violated his right to present a defense by "suppressing" evidence that was relevant and necessary to his theory of the case.[4] The evidence at issue relates to Cornell Burr. Before trial, Willis indicated his intent to pursue a defense based, in part, on the fact that until police officers arrested Key when Willis happened to be present, the investigating officers suspected Burr was Key's accomplice.

The State sought to admit evidence of the telephone call linking Burr and Key, which was necessary to explain why the police were investigating pawnshop transactions associated with Key's telephone number. And to counter the anticipated defense argument that the belated identification of Willis was indicative of a weak case against him and shoddy investigation, the State wanted to present evidence to explain why police initially suspected Burr's involvement. Those reasons included (1) Burr's fingerprints were found in the Impala, (2) he visually resembled the second suspect, especially in the initial video grainy images the

---

[3] The court declared a mistrial as to the trafficking counts and later dismissed them.

[4] Appellant's Br. at 1; see State v. Giles, 196 Wn. App. 745, 756, 385 P.3d 204 (2016) ("The Sixth Amendment of the United States Constitution and article I, section 22 of the Washington Constitution guarantee a criminal defendant a meaningful opportunity to present a defense.")

police obtained, and (3) Burr was a suspect in other residential burglaries that were under investigation around the same time.

Key opposed admission of this evidence because it suggested his "guilt by association."[5]  In view of evidence showing a connection between Key and Burr, Key's counsel argued if the State offered testimony that Burr was implicated in other criminal matters, it would lead to an inference that Key and Burr were involved in "some type of conspiracy" together.[6]  Key also suggested there would be ER 404(b) "problems" if the State were to "elicit testimony regarding the investigation of Mr. Burr as it involves Mr. Key."[7]

Willis claims the trial court preliminarily and correctly determined the evidence of a telephone call between Key and Burr on the date of the crime was relevant and admissible and "implicitly" also ruled all evidence related to Burr's status as a suspect was admissible to rebut the suggestion of a flawed investigation.[8]  He claims the court later "backpedaled" and determined evidence explaining why Burr was initially under suspicion, including his alleged involvement in other crimes, was inadmissible ER 404(b) evidence and was unfairly prejudicial to Key.[9]

---

[5] RP (Mar. 18, 2019) at 84.

[6] RP (Mar. 19, 2019) at 108.

[7] Id. at 102.

[8] Appellant's Br. at 30.

[9] Id.

In fact, the court first reserved ruling on admissibility of all evidence concerning Burr, including the telephone call between Key and Burr and evidence about the initial focus on Burr as the second suspect, until Christiansen testified. But the court revised its ruling after the State pointed out the necessity of eliciting evidence about the telephone call linking Burr and Key on direct examination. The court ruled that evidence of a connection between Burr and Key was admissible and reserved ruling on the admissibility of evidence about "Mr. Burr and how he was known to the detective" until the detective testified, predicting that the testimony would likely come out during cross-examination.[10] The court also ruled that if the detective testified about the basis for suspecting Burr's involvement, that testimony would be limited to the fact that Burr was a "person of interest in a similar crime" without reference to burglaries or a particular geographic area.[11]

In opening arguments, both the prosecutor and Willis's counsel addressed the significance of evidence about Burr. The State informed the jury that police officers found Burr's fingerprints in the Impala and, for that reason, the lead detective initially had reason to believe Burr might be involved in the burglary. The prosecutor explained that Burr's telephone records ultimately led police to investigate Key's pawnshop transaction. Willis's counsel also emphasized that police first identified Burr as the driver of the Impala and changed their position only after Key's arrest.

---

[10] RP (Mar. 19, 2019) at 114.

[11] Id. at 117.

7

During the State's direct examination of Christiansen, Key again objected to the admission of "prejudicial" evidence involving "connections" between him and Burr "involving other alleged activities that may have occurred."[12]  The State confirmed it would not introduce any evidence of "prior bad acts" involving either defendant.[13]  Willis said he intended to present only evidence about the "context" of the initial identification of Burr as the driver.[14]  The court determined that no party was seeking to introduce ER 404(b) evidence, particularly since it had already ruled that if the detective testified at all about the basis for his suspicion of Burr, his testimony would be devoid of details and would not implicate Key. Detective Christiansen then testified only about the links in the investigation that led to the discovery of the pawnshop transaction in Key's name.

On cross-examination, Willis's counsel emphasized that the police found only Burr's fingerprints in the vehicle and that based on review of the photographic and video evidence, the detective initially believed "it was Mr. Burr who was driving [the] Chevrolet Impala."[15]  Willis pointed out that the detective changed his position on the identity of the driver only after the police located Key, who happened to be with Willis at the time of arrest.  Neither Willis nor the State asked about additional reasons why the detective first identified Burr as the driver of the Impala.

---

[12] RP (Mar. 20, 2019) at 375.

[13] Id. at 376.

[14] Id. at 377.

[15] Id. at 431.

Contrary to Willis's argument, the trial court admitted evidence Burr was the initial suspect but did not exclude the evidence he sought to present in support of his defense. And Willis relied on that evidence to support his argument that the State's case as to burglary rested on a flawed investigation and "assumptions."[16] The court correctly determined that evidence of Burr's alleged involvement in other crimes was not attributable to Key or inadmissible under ER 404(b). The only evidence the court excluded was the fact that Burr had allegedly committed the same crime: burglary. Willis does not challenge this aspect of the court's ruling.[17] Willis fails to establish evidentiary error, let alone a violation of his right to present a defense.

Severance

Willis contends Key moved to sever the trials and that he, by not opting out, joined in that motion. He further claims that by failing to recognize the defendants' interests were not aligned and that each defendant had an independent right to a fair trial, the court abused its discretion in denying the motion.

---

[16] RP (Mar. 22, 2019) at 557.

[17] In his reply brief, Willis suggests if the court's ruling allowed his counsel to explore Burr's involvement and other crimes and counsel failed to do so, counsel breached his ethical duties and threw him "under the bus" in order to preserve Key's right to a fair trial. Reply Br at 5. We disagree. Willis now claims his strategy was to delve into "critical connections" between Burr and Key and their joint involvement in prior crimes in order to "point the finger at his co-defendant [Key]." Reply Br. at 6. However, Willis's strategy was not based on implicating Key or suggesting the initial identification of Burr was correct. Instead, he claimed the investigating officer first simply "assumed" Burr was involved in the burglary and then, based on further "assumption, presumptions and conclusions" shifted his focus based on Willis's finding a connection to Key with no solid evidence linking him to the burglary. RP (Mar. 22, 2019) at 557.

9

The record does not bear out Willis's claim that Key moved to sever the trials, and the court denied his motion. Key first mentioned severance as an alternative to redaction in the context of the Bruton[18] issue and the admissibility of Willis's statements. But as it became clear that Willis's out-of-court statements did not name him or even refer to his existence, he expressly agreed that the issue was resolved.

Key again mentioned severance at one point during a discussion about the admissibility of evidence related to Burr. Referring to the cellphone records connecting Key and Burr, Key suggested if the State intended to offer ER 404(b) evidence prejudicial to Key but not to Willis, the trials could be severed. The court observed that evidence linking Burr and Key was not evidence of prior bad acts prohibited by ER 404(b). And the State pointed out that severance would not eliminate the need to present that evidence. Key did not pursue a motion to sever the trials, and Willis did not join such a motion.[19]

Even if we were to construe the discussion in the record as a motion to sever, Willis makes no showing that severance was warranted. A trial court has discretion under CrR 4.4(c)(2)(i) to grant a severance of defendants before trial when "'it is deemed appropriate to promote a fair determination of the guilt or

---

[18] Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968).

[19] The clerk's minutes state that during this discussion, Key made a motion to sever and the court denied the motion. See Clerk's Papers at 144. But the verbatim record of proceedings does not reflect that Key made or the court ruled on such a motion.

innocence of a defendant.'"[20] Our courts do not favor separate trials.[21] A defendant seeking to sever trial from a codefendant bears the burden to demonstrate that a joint trial would be "'manifestly prejudicial'" as to outweigh the concern for judicial economy.[22]

To show that the trial court abused its discretion in denying severance, "the defendant must be able to point to specific prejudice."[23] A defendant may demonstrate specific prejudice by showing (1) conflicting antagonistic defenses that are irreconcilable and mutually exclusive, (2) the inability of the jury to separate massive and complex evidence between the two defendants, (3) the codefendant will make an inculpating statement regarding the moving defendant, and (4) a gross disparity in the weight of the evidence against the two defendants.[24]

Willis does not address any of these factors. He appears to maintain that based on Key's ER 404(b) objection, the trial court "exclude[ed] evidence of the Burr investigation" and undermined his defense.[25] But the court admitted evidence that Burr was the initial suspect in the investigation. Assuming a claim of error

---

[20] In re Pers. Restraint of Davis, 152 Wn.2d 647, 711, 10 P.3d 1 (2004) (quoting State v. Dent, 123 Wn.2d 467, 484, 869 P.2d 392 (1994)).

[21] State v. Moses, 193 Wn. App. 341, 359, 372 P.3d 147 (2016).

[22] Davis, 152 Wn.2d at 711-12 (quoting State v. Hoffman, 116 Wn.2d 51, 804 P.2d 577 (1991)).

[23] State v. Sublett, 176 Wn.2d 58, 69, 292 P.3d 715 (2012).

[24] Moses, 193 Wn. App. at 360 (quoting State v. Canedo-Astorga, 79 Wn. App. 518, 528, 903 P.2d 500 (1995)).

[25] Appellant's Br at 42.

was preserved for review, the court would have acted well within its discretion by denying a severance, and Willis identifies no prejudice resulting from a joint trial.

Ineffective Assistance of Counsel

Willis next claims that trial counsel's representation was constitutionally inadequate because his counsel failed to adequately cross-examine Detective Christiansen. In particular, he points out that during the CrR 3.5 pretrial hearing, the detective testified that the officer leading an interrogation has complete discretion as to whether to record a custodial interview, but at trial, although the detective's "credibility and professionalism" were critically important, counsel failed to make it clear that Willis's interview was unrecorded simply because Christiansen chose not to record it. Therefore, he claims the jury could have reasonably concluded the interview was unrecorded for some other legitimate reason; for instance, because recording technology was not available.

Ineffective assistance of counsel claims present mixed questions of law and fact that we review de novo.[26] To succeed on a claim of ineffective assistance of counsel, a defendant must establish defense counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness and the deficient representation prejudiced the defendant, i.e., there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

---

[26] State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

proceeding would have been different.[27] If a claimant fails to demonstrate one element, a reviewing court need not analyze the other.[28]

Courts are highly deferential to counsel's decisions and strongly presume counsel performed adequately.[29] "'[C]ounsel's performance is adequate as long as his challenged decisions can be characterized as legitimate trial strategy or tactics.'"[30] The extent of cross-examination, in particular, is a matter of judgment and strategy.[31] This court will not find ineffective assistance of counsel based on trial counsel's decisions during cross-examination where counsel's performance falls within the "range of reasonable representation."[32]

Willis's counsel elicited testimony on cross-examination that the detective made no audio or video recording of the interview. Counsel also inquired about the second police officer present for the interview and forced the detective to concede that after Willis made additional statements, the detective did not ask Willis to sign an addendum or write out a second statement. This line of questioning provided a basis for counsel to argue that the jury should not rely on Willis's alleged oral statements because they were not recorded, memorialized in

---

[27] State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).

[28] State v. Foster, 140 Wn. App. 266, 273, 166 P.3d 726 (2007).

[29] Strickland v. Washington, 466 U.S. 668, 689-91, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[30] State v. Carson, 184 Wn.2d 207, 221, 357 P.3d 1064 (2015) (internal quotation marks omitted) (emphasis omitted) (quoting State v. Kyllo, 166 Wn.2d 856, 863, 215 P.3d 177 (2009)).

[31] Davis, 152 Wn.2d at 720.

[32] Id.

a signed statement, or corroborated by the second officer who did not testify at trial. Counsel also argued that without knowing the context of Willis's alleged responses, the jury could not properly evaluate them. Without knowing what the detective's answer would have been to the question of why he chose not to record the interview, we cannot conclude that asking that specific question would have been a better strategy. And it is not evident that any testimony elicited in response to this question would have significantly undermined the State's evidence against Willis.[33]

Willis relies on State v. McSorley.[34] In that case, a key factual question was whether on a particular morning, the defendant was driving around searching for a child to lure and molest, or whether, as he claimed, he was running errands before going to a midmorning doctor's appointment.[35] Defense counsel failed to contact the doctor's office before trial and was therefore unaware the defendant's appointment was in the morning. Defense counsel also failed to object to the police officer's hearsay testimony that he was told McSorley's appointment was in the afternoon.[36]

---

[33] See Davis, 152 Wn.2d at 720 (petitioner unable to establish that the failure to effectively cross-examine a witness could have "overcome" the evidence).

[34] 128 Wn. App. 598, 605, 116 P.3d 431 (2005).

[35] Id. at 609.

[36] Id.

Willis does not identify a failure to investigate a critical factual issue, and McSorley is not analogous or helpful. Willis's counsel's cross-examination of the detective fell within the range of reasonable representation.

Cumulative Error

Willis contends cumulative error warrants reversal. The cumulative error doctrine requires reversal when the combined effect of several errors denies the defendant a fair trial.[37] Because we conclude there are no errors, the doctrine does not apply.

Legal Financial Obligations

Willis challenges the court's imposition of community custody supervision fees in his judgment and sentence. The State concedes that this condition of community custody should be stricken.

We accept the concession. RCW 9.94A.703(2)(d) gives the sentencing court discretion to require the defendant to "pay supervision fees as determined by the department." Here, the court indicated it would "waive all but mandatory [costs] and fees."[38] Despite the court's oral ruling, Willis's judgment and sentence includes the discretionary supervision fee as a condition of community custody. Because the record reflects the court's intent to waive all discretionary legal financial obligations but the judgment and sentence did not do so, we remand for the trial court to strike the provision.

---

[37] State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).

[38] RP (Apr. 8, 2019) at 631.

Statement of Additional Grounds

In a statement of additional grounds, Willis challenges the trial court's ruling on the admissibility of his custodial statements. Specifically, he claims that his alleged oral statements should have been "viewed with extreme suspicion" because, among other things, they were not recorded, incorporated into the signed written statement, or corroborated by the other police officer present during the interview.[39] As explained, these arguments are consistent with his attorney's arguments to the jury. They also go to the weight of the evidence, not admissibility. The trial court found that after Willis was properly informed of his rights under Miranda,[40] he knowingly, voluntarily and intelligently waived those rights, and his statements were voluntary.[41] These uncontested findings are verities on appeal.[42] To the extent Willis raises other issues pertaining to Burr's alleged confession and his inability to call Burr as a defense witness at trial, these matters appear to involve facts and evidence outside the record on direct appeal. A personal restraint petition is the appropriate means to raise these matters.[43]

---

[39] Statement of Additional Grounds at 2.

[40] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

[41] See State v. Athan, 160 Wn.2d 354, 380, 158 P.3d 27 (2007) (custodial statements admissible if State meets its burden to demonstrate a knowing, voluntary, and intelligent waiver of Miranda rights by a preponderance of the evidence).

[42] State v. Piatnitsky, 170 Wn. App. 195, 221, 282 P.3d 1184 (2012).

[43] MacFarland, 127 Wn.2d at 335.

We affirm the conviction but remand for the court to strike the provision of appendix H to the judgment and sentence imposing supervision fees.

WE CONCUR: