# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 48324-6-II |
| Respondent, | |
| v. | consolidated with |
| DAMIEN RAPHAEL DAVIS, | |
| Appellant. | |
| STATE OF WASHINGTON, | No. 48520-6-II |
| Respondent, | |
| v. | |
| MARCUS ANTHONY REED, | UNPUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — Damien R. Davis and Marcus A. Reed were tried together and a jury convicted them of murder in the first degree, two counts of assault in the second degree, and burglary in the first degree, all with firearm enhancements. The jury also found Reed guilty of unlawful possession of a firearm. Both Davis and Reed appeal their convictions, and Reed also appeals his sentence as a persistent offender. They raise numerous other issues. We affirm.

FACTS

I.  THE INCIDENT

On March 28, 2013, Davis and Daniel Davis[1] helped Reed's sister move to a new apartment.  Subsequently, Davis received a call from his child's mother, Kelsey Kelly.  Davis, Daniel, and Reed went to the Morgan Motel.  Daniel and Reed went into a nearby store while Davis went to the motel.

Kelly had been staying with Donald Phily at the Morgan Motel.  When Davis visited Kelly, Phily was also present.  Phily and Kelly had electronic devices, including cell phones and computers, and heroin out in the open.  With Davis present, Kelly spoke to Phily about his friend Keith.  After Davis left, Kelly used heroin and fell asleep.

Davis, Daniel, and Reed returned to Davis and Daniel's apartment.[2]  On the way there, Davis told them that his child was not at the motel, but he saw electronics in the room.  That evening, a man wanting to buy Percocet from Daniel, text messaged him.  Daniel, Davis, and Reed discussed robbing the man.

Reed and Davis went to Reed's house to get a gun.  They returned to the apartment with a black 9 mm handgun.  Daniel took the gun and placed it in Melynda Sue Davis-Orr's purple backpack.  At some point, the three men left to pick up Reed's friend, Ariel Abrejera,[3] to have her drive them around.  When they realized the man seeking the Percocet from Daniel would not

---

[1] Daniel Davis, a co-defendant, has the same last name as one of the appellants.  For clarity we refer to Daniel by his first name.  We intend no disrespect.

[2] Daniel and Davis lived with Melynda Sue Davis-Orr, Daniel's half-sister.

[3] Abrejera's testimony on events differed, but based on the issues raised on appeal, her testimony is not important.  Abrejera pled guilty to murder in the first degree and robbery in the first degree. The State agreed to drop the murder charge if she testified truthfully.

actually buy anything that evening, they returned to the apartment. They discussed robbing Phily "because there was talk about how there was drugs and money in there, and we could sell the electronics for money, too." 6 Report of Proceedings (RP) at 745.

At some point, Reed had switched cars with his wife, and he took his yellow Crown Victoria from her. Abrejera got into the car and drove. Reed sat in the front passenger seat, Daniel sat behind the driver's seat, and Davis sat in the other backseat. Daniel carried the loaded gun. They brought the gun to intimidate Phily into giving them whatever he had. When they arrived at the motel, Reed wanted the gun, and Daniel gave it to him. Davis told Daniel and Reed to knock on the door and use the name Keith, a person Phily knew.

After parking at a nearby store, Abrejera and Davis stayed in the car. The plan was for Daniel to enter the room first with Reed following while brandishing the gun. For about a minute, Reed knocked on the door of Phily's room and claimed he was Keith. The door opened, Daniel pushed his way in, and Reed followed. Daniel and Phily began to scuffle and "the next thing [Daniel knew, he] heard a gun go off." 6 RP at 769.

Earlier in the evening, Phily's friend, Kathy Devine, went to the motel with Mark McGlothlen to visit Phily. While they were there, Kelly remained asleep on the bed. After hearing a loud knocking on the motel door, Phily yelled to the people to leave. Kelly heard someone say it was Keith. The door opened and two men entered. Devine saw one man with a gun against McGlothlen's head, and the other man with a gun struggle with Phily and shoot him.[4] The gunshot killed Phily.

---

[4] Devine testified that there were two guns used in the crime, however, no one else testified about two guns.

After Phily got shot, the shooter held the gun to McGlothlen's face and said, "Give me anything you got." 3 RP at 377. The other man had Devine and Kelly gather electronics. Devine stated that the gun was pointed at her, but she did not know if he meant to point it at her. She was shocked and scared. She feared for her safety.

Kelly awoke around midnight to banging on the door of the motel room. Almost immediately after the door opened, she heard a gunshot. Before that, Kelly turned and ran into the bathroom because she was scared. One of the men came in and asked for some items, and she responded that she did not know where they were located. Kelly stated that the man held a gun, but she could not remember whether he pointed the gun at her. She feared for her safety. After the man exited the bathroom, Kelly grabbed some of her belongings and ran out to her mother's house.

A few seconds after taking cell phones, laptops, and a wicker basket filled with miscellaneous items, Daniel and Reed returned to the vehicle. Daniel had a gash on his arm. Reed bragged about shooting Phily and apologized for hitting Daniel's arm when he fired the shot. Days later, Abrejera hid the gun.

II.    CHARGES

The State charged Davis and Reed as principals, and in the alternative as accomplices, with murder in the first degree (count I); robbery in the first degree (count II); two counts of assault in the second degree (counts III, V); burglary in the first degree (count VI); unlawful possession of a

firearm in the second degree (count VII).[5] All counts included firearm enhancements, with the exception of count VII.[6]

III.    TRIAL

A.    MOTION TO SEVER

In anticipation of the State offering Davis's post-arrest statement to law enforcement, Reed moved to sever defendants. Davis confessed to law enforcement that Reed had the idea to rob someone, that they used Reed's gun and car in the crime, that Reed and Daniel robbed the occupants of the motel room, and that Reed shot Phily. Davis also stated that Reed bragged about shooting Phily and apologized to Daniel for injuring him when he fired the shot.

Reed argued that the State's redactions were insufficient to eliminate prejudice to him because the statements still clearly referred to him. Davis did not object to the severance. The State's redactions changed references to Reed to, "the other guy," "this one guy," and "he." *See e.g.*, Clerk's Papers (CP) (Reed) at 76.

The trial court found that the redacted interview did not include direct reference to Reed, and the statements did not violate the confrontation clause. The trial court denied Reed's motion to sever with the condition that the State redact any reference to the precise number of participants in the crime. After the State made the ordered redactions, Reed maintained his objection. The final redactions changed references to Reed to "he" or were omitted.

---

[5] Count IV is not included in the second amended information. RCW 9A.32.030(1)(c) (count I); RCW 9A.56.190 and 9A.56.200(1)(a)(i) (count II); RCW 9A.36.021(1)(c) (counts III, V); RCW 9A.52.020(1)(a), (b) (count VI); RCW 9.41.040(2)(a) (count VII).

[6] RCW 9.94A.530, RCW 9.94A.533.

Before the trial court played Davis's redacted statement to the jury, Reed renewed his objection. The court gave a limiting instruction that the jury could consider the statement as evidence against Davis, but not Reed.

B. FINDINGS OF FACT AND CONCLUSIONS OF LAW ENTERED ON CONFESSION HEARING

A different judge than the one trying the case held a hearing on the admissibility of Davis's confession and ruled it admissible. The State told the trial judge that the findings of fact and conclusions of law from the hearing had not been entered. The State noted that the parties did not dispute the facts. It provided the trial judge with proposed findings and conclusions and a copy of the transcript from the hearing. The trial court stated, "I did read through the transcript, as well as the State's Findings of Fact and Conclusions of Law. When the parties think that they are prepared to ask the Court for either a signature or some other action, please let me know." 2 RP at 155-56. Davis did not object and his lawyer signed the order entered by the trial court.

C. DANIEL'S PRIOR STATEMENT TO LAW ENFORCEMENT

On April 2, 2013, Daniel provided a taped statement to police. When he made the statement, Daniel was under arrest for a Department of Corrections violation. Daniel gave the following story to the police.

After Davis told Reed and Daniel about visiting Kelly and Phily, Reed tried to convince Daniel to rob Phily, but Daniel refused. Eventually, Reed scared Daniel into robbing Phily. Abrejera and Davis stayed in the car. When Reed and Daniel reached the motel room, Daniel entered first, and a few seconds later the gun went off. Reed shot Phily. Reed pointed the gun at Daniel to grab whatever he could, and Daniel feared Reed would shoot him. Daniel grabbed whatever he could from the room and ran back to the car. When they returned to the apartment, Reed bragged that he shot Phily.

6

Daniel testified at trial that he participated in planning the crime to rob Phily. He claimed Davis originated the idea. Daniel admitted that he and Reed were the men who entered the motel room, but claimed Reed carried the gun and shot Phily. He admitted that they took cell phones and laptops from the motel room.

On cross-examination, Daniel admitted that the State offered him a plea agreement with a significantly lesser sentence if he testified truthfully at trial. He admitted that he initially lied to police when he told them that he participated in the crimes because Reed threatened him and he believed Reed would kill him if he did not participate. He admitted he lied to the police because he hoped they would make him a deal.

Both Davis and Reed cross-examined Daniel on whether his plea agreement allowed him to reduce a potential sentence of 60 to 70 years of confinement. Davis asked, "And what you are really hoping to do is convince the prosecutor that you are a helpful witness, so that you can get the deal, right? . . . Aren't you just saying things that you think are going to help to keep you from going to prison for a long time?" 7 RP at 992.

The State moved to admit the audio recording of Daniel's arrest statement as a prior consistent statement. Davis conceded that the statement in question occurred before the proffer or the plea agreement. The trial court admitted the statement as a prior consistent statement, because the defendants challenged the credibility of the witness and the prior statement predated a motive to lie.

D.    DAVIS-ORR TESTIMONY

Davis-Orr initially testified that either Reed, Davis, or Daniel said he wanted to rob somebody, but she could not recall who made the statement. She did recall that all three of them were conversing at the time.

On cross-examination, Davis-Orr testified that she never told the police that she heard anyone say they were going to rob somebody. She responded that she actually did not know who specifically said they wanted to commit a robbery.

On redirect, Davis-Orr again testified she did not recall anyone saying they were going to rob somebody. The State asked whether Davis-Orr based her conclusion that they were going to rob someone on her observations. Reed objected on the basis of "speculation." 9 RP at 1266. The trial court overruled the objection. The State again asked a similar question. Davis objected, arguing the question included multiple questions, was vague, and also constituted improper speculation and opinion. The trial court overruled the objections. On further redirect, Davis-Orr testified that she told law enforcement, "I kind of already figured that they did a robbery, but I didn't know it was a murder." 9 RP at 1270-71.

After Davis-Orr completed her testimony and outside the presence of the jury, Reed raised the issue that the testimony constituted improper opinion evidence and improper impeachment. Davis joined in the objection. The State responded that the evidence was not offered as impeachment evidence. It was offered to demonstrate that she deduced they committed a robbery based on her observations.

The trial court stated that

> because what the State did was an attempt to rehabilitate a witness who expressed herself, and also demonstrated consistent poor memory about the events of that particular night, based on the questions that were asked by defense counsel, I believe that the statement there was proper in that form of rehabilitation, given what the cross-examination was.

9 RP at 1275.

E.      JURY INSTRUCTIONS

The court gave a limiting instruction to the jury on Davis-Orr's testimony:

> Certain evidence has been admitted in this case for only a limited purpose. This evidence consists of testimony by [Davis-Orr] that she ". . . figured that they had done a robbery," and may be considered by you only for the purpose of evaluating the state of mind of [Davis-Orr]. You may not consider it for any other purpose. Any discussion of the evidence during your deliberations must be consistent with this limitation.

CP (Davis) at 271 (Instr. 11). Both Reed and Davis objected to this instruction on the basis that Davis-Orr's state of mind was irrelevant. However, Davis acknowledged that he would rather have the instruction than not.

In addition, the court instructed the jury:

> The State must prove an accomplice had general knowledge of the charged crime. The State is not required to prove the accomplice had knowledge of every element of the charged crime.
> Thus, the State must prove beyond a reasonable doubt an accomplice in a charged crime of robbery in the first degree had general knowledge of the crime of "robbery." The State is not required to prove an accomplice had knowledge that another participant would be armed with a deadly weapon or would inflict bodily injury.
> The State must prove beyond a reasonable doubt an accomplice in a charged crime of burglary in the first degree had general knowledge of the crime of "burglary." The State is not required to prove an accomplice had knowledge that another participant would be armed with a deadly weapon or would assault any person.
> The State must prove beyond a reasonable doubt an accomplice in a charged crime of assault in the second degree had general knowledge of the crime of "assault." The State is not required to prove an accomplice had knowledge the assault would be committed with a deadly weapon.

CP (Davis) at 280 (Instr. 20).[7]

F.      CLOSING ARGUMENTS

---

[7] Davis challenges this jury instruction and quotes it in his brief, but miscited the instruction as jury instruction 23.

While describing the concept of reasonable doubt in closing argument, the prosecutor began to make an analogy to a puzzle. Both Davis and Reed objected, arguing that the analogy trivialized and misstated the State's burden of proof.

Outside the presence of the jury, the trial court heard arguments on the objections. The trial court acknowledged that the puzzle analogy had come under criticism of reviewing courts, but overruled the objection.

The jury returned and the prosecutor continued to argue the analogy:

> Think about going on a ferry, and for those that have gone on a ferry, oftentimes there are puzzles on a table left behind. . . . Imagine no box, and so you don't know what the image is. You sit down to do a puzzle and you are putting it together and there are pieces and you just don't know what to do with them. You have tried it on every conceivable spot. You can't figure it out, so you set it aside.
>
> There may have been pieces of the puzzle that, frankly, were gone before you even sat down to do the puzzle. You may at some point get to the point of putting together that puzzle and realize what the image is. And you are confident beyond a reasonable doubt as to what that image is, even though, maybe again, there were pieces that disappeared before you even sat down, even though there are pieces that you had to set aside because you don't know what to do with.
>
> Now, take that concept and think about this trial, because a trial is in many respects like putting together a puzzle. You are offered a large quantity of evidence, like pieces of a puzzle, and those pieces of evidence are intended to be put together in such a fashion that when you view them in total there is an image that convinces you beyond a reasonable doubt as to the defendant's guilt. You may have pieces of evidence, like pieces of a puzzle, you just don't know what to do with, right? It may be an entire witness's testimony that you just can't make heads nor tails of. It may be only parts of a witness's testimony that you just can't make heads nor tails of, so that witness or what he or she had to say, you just disregard.
>
> Likewise, there may be pieces of evidence or pieces of a puzzle that you never receive in the first place, that you can conceive that might exist out there somewhere in the ether, but you didn't hear about it. And yet, still the question for all of you is the evidence that you have received, those pieces of the puzzle, when you have put all of that evidence together are you convinced beyond a reasonable doubt as to the image? And the image here is the defendant's guilt of the charged crimes. So I offer that to you as one way to think about proof beyond a reasonable doubt.

13 RP at 1786-87.

The State argued that Reed and Davis could both be found guilty as accomplices, but if the jury found Reed shot the gun, he was also guilty as a principal. The prosecutor also argued:

> Now, let's focus on the central issue in this case. There is really only one, because when you think about this central issue, you came to realize that if [Davis] and [Reed] were party to a robbery, they are guilty of the charged offenses here. If they were party to a robbery, their guilt as to each of these offenses flows naturally.

13 RP at 1787. Reed objected to this statement, but the trial court overruled the objection. The prosecutor continued,

> If I shoot someone in your presence, guess what? You are scared out of your mind that you might be next. And so, when [Devine] and [Kelly] witnessed [Phily] shot inexplicably with a gun and he is dying in front of them, are they victims of an assault at that moment? Absolutely. Absolutely. The men who have come into that room have put them in fear for their lives. And again, that assault was perpetrated with a firearm, and it is the very act of coming into that room and shooting [Phily] in their presence with [Devine] and [Kelly] watching, watching that gun go off, and if they didn't see the gun, watching him be shot, and if they don't see him watching him be shot, hearing him, watching him stumble to the ground, clearly having been shot by a gun, the men in the room with a gun, they are victims of an assault, and that assault has been perpetrated with a gun, with a firearm.

13 RP at 1813.

In rebuttal, the prosecutor argued:

> It's my opportunity to respond to the arguments of [defense counsel], and to that end I want you to understand, and I'm sure that you appreciate, the State, both myself and [co-counsel], have a great deal of respect for [defense counsel] and the job that they do. Everyone who is charged with a crime is entitled to representation. And everyone is entitled to vigorous representation and an advocate that will fight for you, but don't confuse vigorous advocacy with there being any merit to what [defense counsel] said to you during their comments.

13 RP at 1878. Reed objected to the statement, but the trial court overruled the objection.

The prosecutor also argued in rebuttal:

> The act that [Reed] and Daniel Davis did, the act that they did that makes them responsible for Second Degree Assaults for [Devine] and [Kelly], the act, it's barging into the room. That is an act, barging into a room. They are there. They are guests. This is a happy place. It's supposed to be a happy place, and two men,

uninvited, forced their way in.  That's an act, and then one of those men has a gun, and then one of those men shoots [Phily]. . . . What's the act they did?  That's the act.  The act of invading that space, one of them armed with a gun, one of them shooting [Phily]. . . .

What is the definition of assault? Any act that puts one in a reasonable apprehension of harm.  Were [Kelly] and [Devine] in those moments assaulted?  Absolutely.  Were they put in fear for their safety?  Absolutely.  And was part of the fear for their safety, is it because one of the men was armed with a deadly weapon?  Absolutely.  That's what makes them victims of Second Degree assault.

13 RP at 1889-90.

IV.    VERDICT AND SENTENCE

The jury found Davis and Reed guilty of murder in the first degree (count I), both counts of assault (count III, V), and burglary in the first degree (count VI).  The jury also found Reed, but not Davis, guilty of unlawful possession of a firearm (count VII).  The jury found Davis and Reed not guilty of robbery in the first degree (count II).  The jury found that Davis and Reed were armed with a firearm on every count, with the exception of Reed's unlawful possession of a firearm conviction.

The trial court sentenced Davis to a total of 642 months of confinement.  The trial court admitted certified copies of the judgment and sentences from Reed's prior convictions for robbery in the second degree and robbery in the first degree in 2007, and a conviction for robbery in the second degree in 2009.  Based on these convictions, the trial court determined that Reed was subject to sentencing as a persistent offender.  The trial court sentenced Reed to confinement for life without the possibility of release as a persistent offender.

Reed and Davis both appeal.

ANALYSIS

I.     DAMIEN DAVIS

       A.     KNOWLEDGE JURY INSTRUCTION FOR ACCOMPLICE LIABILITY

Davis argues that he received ineffective assistance of counsel when his lawyer did not

offer an instruction defining knowledge as the word is used in the accomplice liability instruction.[8]

We disagree.

              1.     Legal Principles

Jury instructions are appropriate if they allow the parties to argue their theories of the case,

do not mislead the jury, and do not misstate the law. *State v. Stevens*, 158 Wn.2d 304, 308, 143

P.3d 817 (2006). We review de novo whether the jury instructions, when read as a whole,

adequately state the applicable law. *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006).

"[J]ury instructions read as a whole must make the relevant legal standards manifestly apparent to

the average juror." *State v. Marquez*, 131 Wn. App. 566, 575, 127 P.3d 786 (2006).

The Sixth Amendment to the United States Constitution and article I, section 22 of the

Washington Constitution guarantee the right to effective assistance of counsel. *Strickland v.

Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

We review claims of ineffective assistance of counsel de novo. *State v. Sutherby*, 165

Wn.2d 870, 883, 204 P.3d 916 (2009). To prevail on a claim of ineffective assistance of counsel,

the defendant must show both (1) that defense counsel's representation was deficient, and (2) that

the deficient representation prejudiced the defendant. *State v. Grier*, 171 Wn.2d 17, 32-33, 246

P.3d 1260 (2011) (applying *Strickland*, 466 U.S. at 685-86). Representation is deficient if after

---

[8] Davis also assigns error to the trial court's failure to instruct the jury on the definition of knowledge in the accomplice liability instruction. This issue is addressed within this section.

considering all the circumstances, the performance "'falls below an objective standard of reasonableness.'" *Grier*, 171 Wn.2d at 33 (quoting *Strickland*, 466 U.S. at 688). Prejudice exists if there is a reasonable probability that except for counsel's errors, the result of the proceeding would have differed. *Grier*, 171 Wn.2d at 34.

An appellant faces a strong presumption that counsel's representation was effective. *Grier*, 171 Wn.2d at 33. Legitimate trial strategy or tactics cannot serve as the basis for a claim of ineffective assistance of counsel. *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009). "Conversely, a criminal defendant can rebut the presumption of reasonable performance by demonstrating that 'there is no conceivable legitimate tactic explaining counsel's performance.'" *Grier*, 171 Wn.2d at 33 (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). The defense counsel's strategic decisions must be reasonable. *Grier*, 171 Wn.2d at 34.

> 2. Davis Did Not Receive Ineffective Assistance

Davis argues that his attorney's failure to request WPIC 10.02[9] as an instruction constituted deficient performance because the word knowledge was used in the accomplice instruction. WPIC 10.02 states:

> A person knows or acts knowingly or with knowledge with respect to a [fact] [circumstance] [or] [result] when he or she is aware of that [fact] [circumstance] [or] [result]. [It is not necessary that the person know that the [fact] [circumstance] [or] [result] is defined by law as being unlawful or an element of a crime.]
> If a person has information that would lead a reasonable person in the same situation to believe that a fact exists, the jury is permitted but not required to find that he or she acted with knowledge of that fact.
> [When acting knowingly [as to a particular fact] is required to establish an element of a crime, the element is also established if a person acts intentionally [as to that fact].]

---

[9] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 10.02, at 206 (3d ed. 2008) (WPIC).

To constitute ineffective assistance of counsel, we must determine whether (1) the defendant was entitled to the instruction; (2) failure to offer the instruction was tactical; and (3) if the defendant was prejudiced by the failure to offer the instruction. *State v. Powell*, 150 Wn. App. 139, 154-58, 206 P.3d 703 (2009).

Due process requirements are met when a trial court instructs the jury on all elements of an offense and that unless each element is established beyond a reasonable doubt, the defendant must be acquitted. *State v. Scott*, 110 Wn.2d 682, 690, 757 P.2d 492 (1988). Further, "'[t]he court in the trial of a criminal case is required to define technical words and expressions, but not words and expressions which are of ordinary understanding and self-explanatory.'" *Scott*, 110 Wn.2d at 689 (quoting *State v. Lyskoski,* 47 Wn.2d 102, 111, 287 P.2d 114 (1955)) (internal quotations omitted).

The exact argument Davis makes in this case has been rejected. The failure to define knowledge, is not error. *Scott*, 110 Wn.2d at 687. In *Scott*, an accomplice complained that the failure to define "knowledge" for the jury, as it was used in the accomplice instruction, constituted error. 110 Wn.2d at 691. The court disagreed because "knowledge" is not a technical term that requires a jury to be instructed on its meaning, even though WPIC 10.51 recommends its use. *Scott*, 110 Wn.2d at 692. Therefore, because the trial court need not have instructed the jury on the definition of knowledge for accomplice liability, we conclude that Davis's counsel was not deficient by failing to request the instruction.

Davis claims he was prejudiced by his attorney's failure to request a definitional instruction because "the jury was not told that it could find that he did not act with the knowledge that he was aiding in a crime despite what a reasonable person would have believed in the same situation." Br. of Appellant Davis at 31. He also argues that if his attorney had proposed the instruction, his

15

attorney could have "expanded" his closing argument that Davis did not know the extent of the crime. Br. of Appellant Davis at 30.

As analyzed above, the failure to request a definitional instruction did not constitute deficient performance. Even if it did, Davis has not shown prejudice. Davis's theory was that he tried to stop the crime from occurring, not that he did not have knowledge of it. He made that point in closing argument. Therefore, we conclude that the trial court did not err by failing to give an instruction defining knowledge, and that Davis failed to show he received ineffective assistance of counsel.

B.      CrR 3.5 HEARING FINDINGS OF FACT AND CONCLUSIONS OF LAW

Davis argues that the trial court exceeded its authority by entering findings of fact and conclusions of law for a CrR 3.5 hearing heard by a predecessor judge. We disagree.[10]

Under RCW 2.28.030(2), a judicial officer is disqualified from acting as a judge when "he or she was not present and sitting as a member of the court at the hearing of a matter submitted for its decision." The general rule is that "a successor judge is without authority to enter findings of fact on the basis of testimony heard by a predecessor judge." *State v. Bryant*, 65 Wn. App. 547, 549, 829 P.2d 209 (1992). "The rule is applied even where the prior judge had entered an oral decision . . . or a memorandum decision." *Bryant*, 65 Wn. App. at 549. "'Taken together, the case law and [court] rules set forth the rule that a successor judge only has the authority to do acts which do not require finding facts. Only the judge who has heard evidence has the authority to find facts.'" *In re Marriage of Crosetto*, 101 Wn. App. 89, 96, 1 P.3d 1180 (2000) (quoting *Bryant*, 65 Wn. App. at 550).

---

[10] The State argues the issues is waived because of the invited error doctrine. *State v. Case*, 187 Wn.2d 85, 384 P.3d 1140 (2016). We disagree and consider the issue on the merits.

Nevertheless, the parties may agree to allow a successor judge to make findings of fact based on the evidence in the record. *Crosetto*, 101 Wn. App. at 96. *Crosetto* held that "there is no necessity for a new trial where, as here, the parties agree to allow the successor judge to rely on the record. Therefore, we hold that the successor judge did not abuse his discretion in making findings of fact based upon the original record." 101 Wn. App. at 98.

Here, it is clear that the successor judge made findings after reading the transcript from the hearing and made findings. There were no disputed facts adduced at the hearing. Therefore, there was no error by the successor judge in entering the findings of fact and conclusions of law.

## II.    MARCUS REED

### A.    SEVERANCE MOTION AND CONFRONTATION CLAUSE

Reed argues that the trial court erred by denying his severance of defendants motion because the redaction of Davis's statements did not protect Reed's right to confrontation. Reed also argues that the violation of his right to confrontation was not harmless.[11]

We conclude that the trial court erred by denying the motion to sever because some of the redactions to Davis's statement were insufficient and violated Reed's right to confrontation. However, the error was harmless beyond a reasonable doubt. Thus, the trial court's denial of Reed's motion to sever is not reversible error.

---

[11] In his Statement of Additional Grounds (SAG), Reed makes the same arguments on this issue as did his appellate counsel.

1.      Standard of Review and Legal Principles

a.      Severance Generally

"Separate trials are not favored in this state." *State v. Dent*, 123 Wn.2d 467, 484, 869 P.2d 392 (1994); *State v. Campbell*, 78 Wn. App. 813, 819, 901 P.2d 1050 (1995). Severance of defendants is discretionary with the trial court. *Dent*, 123 Wn.2d at 484-85. We review a trial court's decision on a motion for severance under CrR 4.4(c) for a manifest abuse of discretion. *State v. Rodriguez*, 163 Wn. App. 215, 228, 259 P.3d 1145 (2011); *State v. Wood*, 94 Wn. App. 636, 641, 972 P.2d 552 (1999). A trial court abuses its discretion when its decision is manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons. *State v. Barry*, 184 Wn. App. 790, 802, 339 P.3d 200 (2014).

The defendant "must be able to point to specific prejudice" to support a claim that the trial court abused its discretion. *Wood*, 94 Wn. App. at 641. "'Defendants seeking severance have the burden of demonstrating that a joined trial would be so manifestly prejudicial as to outweigh the concern for judicial economy.'" *State v. Moses*, 193 Wn. App. 341, 359, 372 P.3d 147, *review denied*, 186 Wn.2d 1007 (2016) (quoting *State v. Bythrow*, 114 Wn.2d 713, 718, 790 P.2d154 (1990)).

We review alleged violations of the confrontation clause de novo. *Moses*, 193 Wn. App. at 356. The Sixth Amendment to the United States Constitution states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."

b.      *Bruton* Issues

Under the confrontation clause, out-of-court testimonial statements by non-testifying witnesses are barred because of their prejudicial impact unless the declarant is unavailable and the

defendant had a prior opportunity to cross-examine the witnesses. *Crawford v. Washington*, 541 U.S. 36, 54-55, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). *Bruton v. United States*, 391 U.S. 123, 126, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968) held that a criminal defendant is denied his right of confrontation when a nontestifying codefendant's confession that names the defendant as a participant in the crime is admitted at a joint trial, even where the court instructs the jury to consider the confession only against the codefendant.

CrR 4.4(c) insures compliance with *Bruton*. It provides,

> (1) A defendant's motion for severance on the ground that an out-of-court statement of a codefendant referring to him is inadmissible against him shall be granted unless:
> . . . .
> (ii) deletion of all references to the moving defendant will eliminate any prejudice to him from the admission of the statement.

"'[T]he United States Supreme Court held [in *Bruton*] that the defendant was deprived of his confrontation rights under the Sixth Amendment when he was incriminated by a pretrial statement of a codefendant who did not take the stand at trial." *State v. Hoffman,* 116 Wn.2d 51, 75, 804 P.2d 577 (1991). "But in *Richardson v. Marsh*, 481 U.S. 200, 208, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987), the United States Supreme Court held that a confession redacted to omit all reference to the codefendant fell outside *Bruton*'s prohibition because the statement was 'not incriminating on its face' and became incriminating 'only when linked with evidence introduced later at trial (the defendant's own testimony).'" *Moses*, 193 Wn. App. at 356-57.

"*Bruton* applies to inculpatory statements." *Moses*, 193 Wn. App. at 357. The *Bruton* Court recognized the "powerfully incriminating" effect of the extrajudicial statements of a codefendant "who stands accused side-by-side with the defendant." 391 U.S. at 135-36. "Not only are the statements 'devastating to the defendant, but their credibility is inevitably suspect.'"

*Moses*, 193 Wn. App. at 357 (quoting *Bruton*, 391 U.S. at 135-36). However, "[s]tatements that do not incriminate a codefendant are not subject to the *Bruton* rule." *Moses*, 193 Wn. App. at 357.

"[A] non-testifying codefendant's statement violates the confrontation clause unless certain criteria are met when redacting the statement." *Moses*, 193 Wn. App. at 357. "Redacted statements must be (1) facially neutral, i.e., not identify the non-testifying defendant by name (*Bruton*[, 391 U.S. 123] ); (2) free of obvious deletions such as 'blanks' or 'X' (*Gray* [*v. Maryland*, 523 U.S. 185, 118 S. Ct. 1151, 140 L. Ed. 2d 294 (1998)] ); and (3) accompanied by a limiting instruction (*Richardson*[, 481 U.S. 200])." *Moses*, 193 Wn. App. at 357 (internal quotation marks omitted).

We rejected the use of an "other guy" redaction where only two accomplices committed the crime and only two defendants were on trial. *State v. Vincent*, 131 Wn. App. 147, 154, 120 P.3d 120 (2005). Yet *State v. Medina* approved the admission of the codefendant's statement because the redactions were so varied among six possible accomplices ("'other guys,' 'the guy,' 'a guy,' 'one guy,' and 'they'") that the redactions did not clearly imply whether the codefendant's statement referred to either the appellant or the other codefendant. 112 Wn. App. 40, 51, 48 P.3d 1005 (2002).

In *State v. Fisher*, 185 Wn.2d 836, 845, 374 P.3d 1185 (2016), the court held that:

> the exact form of the redaction is not dispositive. Rather, under [*Richardson*] and *Gray*, the question is whether the redaction obviously refers to the defendant. We decline to adopt the bright line rule of some circuit courts that a neutral pronoun always satisfies *Bruton* and instead hold that whatever the form of the redaction, it must be clear that the redaction does not obviously refer to the defendant.

### 2. Redactions

Based on the preceding, we review the State's redactions to Davis's statement. Throughout the redacted version of Davis's statement, Reed's name was replaced with "he" or omitted.

20

Reed challenges some specific statements. He challenges Davis's statements regarding Reed looking for someone to rob, Reed's seating position in the vehicle, Reed's apologies after the crime for shooting Phily, that they helped Reed's sister move, and that Reed switched cars with his wife.

Reed also challenges the redactions in general terms based on the use of "he" throughout the statement. We need not consider the other instances from the interview because he did not properly raise them. *Moses*, 193 Wn. App. at 357; RAP 10.3(a)(6). It is Reed's obligation to point to the specific parts of the record he claims constitutes error. RAP 10.3(a)(6). "'Without adequate, cogent argument and briefing, [this court will] not consider an issue on appeal.'" *Moses*, 193 Wn. App. at 357 n.10 (quoting *Schmidt v. Cornerstone Invs., Inc.*, 115 Wn.2d 148, 160, 795 P.2d 1143 (1990)).

Here, we conclude that a number of the redactions were inadequate because the statements referred to a woman and Daniel, accomplices to the crimes. Because the crimes involved four defendants, and because Davis made the statement, it was clear that "he" must have referred to Reed as the final and fourth accomplice. Thus, these statements violated the confrontation clause. *Vincent*, 131 Wn. App. at 154. Yet the error here was harmless because overwhelming independent evidence demonstrated Reed's involvement in the crimes. *See Vincent*, 131 Wn. App. at 154-55.

The statements challenged by Reed on appeal that violated *Bruton* include: When Davis stated, "[w]e pulled up, he went inside, grabbed the gun, came back . . . to the car." Ex. 70A, at 9. After they retrieved the gun, Davis explained:

> That's when we got to um, go to Melynda's so he can give Danny the gun to put up, to stash while we're helping his sister move. He didn't want to travel with the gun, you know, up and down the street. So he gave Danny the gun, cause

Danny didn't want to help move, so he's like well just hold this, stay here, you know, hold it til I come back home, you know, don't leave.

Ex. 70A, at 9.

Another statement includes when Davis stated exactly where the occupants of the vehicle

sat on the way to the motel:

[Detective]: When does, when she gets in the car, does she get in the driver's seat?
Davis: Yeah. He wanted her to drive.
[Detective]: Okay. And he's sitting in the front passenger?
Davis: Um-hum.
[Detective]: You're behind the driver?
Davis: No, passenger.
[Detective]: You're behind the passenger and Danny's behind the driver?
Davis: Yes.

Ex. 70A, at 18.

The third statement that violated *Bruton* was when Davis described being around other

people at their apartment after the shooting:

Well I wanted, I wanted to tell him to shut up, but Danny . . . kinda like, like telling him to shut up, don't be talking about this around these people because, you know, everybody doesn't need to know, you know. But he still was, I, I didn't mean to shoot him, but he, he rushed me man. I, I mean I told you, I'm not scared.

Ex. 70A, at 27.

The final statement that violated *Bruton* was when Davis stated: "Cause the gun was at

Melynda's, like, you know, he gives it to Danny so he's not driving with the gun, so he don't, he's

not scared to drive around, but he's you know, probably scared to drive around with a, with a gun."

Ex. 70A, at 32.

However, there are a number of other statements challenged by Reed which do not violate

*Bruton* because they are either non-incriminatory, facially neutral, or they do not clearly identify

Reed without the help of other evidence. *Moses*, 193 Wn. App. at 357. These statements include

when Davis described Reed's plan to rob the man calling to purchase Percocet, Davis's description

of helping Reed's sister move, and when Davis told law enforcement that they used the yellow car, not a white SUV they rode in earlier.

Therefore, because many of the challenged portions of Davis's statement included obvious references to Reed as the final accomplice, the redactions violated Reed's right to confrontation. Although the trial court provided the necessary limiting instruction, the use of Davis's redacted statement violated Reed's confrontation rights under *Bruton* and its progeny. Accordingly, the trial court erred by admitting Davis's redacted statements.

> 3.    Harmless Error

Confrontation clause violations are subject to a constitutional harmless error analysis. *Fisher*, 185 Wn.2d at 847. A constitutional error is harmless if we are persuaded beyond a reasonable doubt that the jury would have reached the same result in absence of the error. *State v. Watt*, 160 Wn.2d 626, 635, 160 P.3d 640 (2007). "The test is whether the untainted evidence was so overwhelming that it necessarily leads to a finding of guilt." *Fisher*, 185 Wn.2d at 847.

Here, untainted, overwhelming evidence existed against Reed. That evidence includes the following. Daniel and Abrejera each testified to Reed's involvement in the crimes, including looking to rob someone that evening. Daniel testified that Reed retrieved the gun used from his house. The gun used in the crime was registered to Reed's former father-in-law. The car used in the crime was Reed's car. When they arrived at the motel, Reed wanted the gun, and Daniel gave it to him. Daniel identified Reed as the shooter. Therefore, we conclude that the confrontation clause violation was harmless beyond a reasonable doubt and the trial court's denial of Reed's motion to sever does not warrant reversal.

B.    DAVIS-ORR'S TESTIMONY

Reed argues that the trial court erred by admitting Davis-Orr's testimony because she provided an opinion on his guilt. The State argues the issue is not preserved for review.

We need not decide if the trial court erred by admitting the testimony because even if it did, any error was harmless.

This issue has been preserved for appeal. Under RAP 2.5(a), a defendant generally may not raise an error for the first time on appeal unless it is a manifest constitutional error. *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007). A trial court commits constitutional error by allowing improper opinion testimony, but such an error is not manifest from the appellate record if the jury was properly instructed that it alone must determine the facts and credibility of witnesses. *State v. Montgomery*, 163 Wn.2d 577, 595, 183 P.3d 267 (2008). The jury was instructed in such a way.

An appellant must make his own objection and cannot rely on a codefendant's objection to preserve the error for appeal. *State v. Davis*, 141 Wn.2d 798, 850, 10 P.3d 977 (2000). Initially, Reed's counsel objected to Davis-Orr's testimony on the basis of speculation during redirect examination. Davis objected on the basis of improper opinion. Davis and Reed challenged Davis-Orr's statement that the men planned to rob someone. On further redirect, Davis-Orr testified that she "kind of already figured that they did a robbery." 9 RP at 1271. The trial court provided a limiting instruction regarding this testimony. Immediately after the testimony, the jury was excused for recess, and the parties had a colloquy with the trial court. During that colloquy, Reed objected to Davis-Orr's testimony on the basis of improper opinion. "Where, however, the litigants have advanced the issue below, giving the trial court an opportunity to rule on relevant authority, and the court does so rule, it may not be necessary to object at the time of admission of

24

the claimed erroneous evidence in order to preserve the issue for appeal." *State v. Sullivan*, 69 Wn. App. 167, 170, 847 P.2d 953 (1993). Therefore, we conclude that Reed preserved the issue for appeal.

"Trial courts are afforded broad discretion in deciding whether to admit evidence, including testimony." *State v. Olmedo*, 112 Wn. App. 525, 530, 49 P.3d 960 (2002). We review a trial court's decision to admit or deny evidence for an abuse of discretion. *Olmedo*, 112 Wn. App. at 530. A trial court abuses its discretion only if no reasonable person would adopt the view espoused by the trial court. *Olmedo*, 112 Wn. App. at 530.

Even if the trial court abused its discretion by admitting Davis-Orr's testimony, we conclude that any error was harmless. "Permitting a witness to testify as to the defendant's guilt raises a constitutional issue because it invades the province of the jury and the defendant's constitutional right to a trial by jury." *Olmedo*, 112 Wn. App. at 533. An error of constitutional magnitude is presumed prejudicial, and the State bears the burden of proving the error was harmless beyond a reasonable doubt. *State v. Spotted Elk*, 109 Wn. App. 253, 261, 34 P.3d 906 (2001). "A constitutional error is harmless only when the untainted evidence provides an overwhelming conclusion of guilt." *Olmedo*, 112 Wn. App. at 533.

If the court erred, it was harmless. First, the jury did not convict Davis or Reed for the robbery charge. In addition, the trial court provided a limiting instruction on Davis-Orr's testimony instructing that her testimony that she ". . . figured that they had done a robbery," could only be considered for the purpose of evaluating her state of mind. CP (Davis) at 271 (Instr. 11). As outlined in the facts above, the untainted evidence was overwhelming that Reed, Davis, and Daniel planned and carried out assaults while armed with a loaded gun. They did so in an effort to intimidate Phily into giving them whatever property he possessed. Daniel and Reed took items

from Phily and shot him when they entered the motel room. Therefore, since we presume the jury follows its instructions, our review of the entire record and the other overwhelmingly untainted evidence shows that if an error occurred, it was harmless beyond a reasonable doubt. *State v. Anderson*, 153 Wn. App. 417, 428, 220 P.3d 1273 (2009).

C.      IMPOSITION OF PERSISTENT OFFENDER SENTENCE

Reed argues that the trial court erred by imposing a persistent offender sentence without a jury finding on his prior offenses because it deprived him of his right to a jury trial and due process. We disagree.

Reed bases his argument on recent United States Supreme Court decisions. However, he also acknowledges that the "Washington Supreme Court has rejected the argument Reed makes here." Br. of Appellant Reed at 32. He is correct that our Supreme Court rejected his argument, and thus, his claim fails.

1.      Standard of Review

A persistent offender is a person who has been convicted in Washington of a most serious offense, and has on at least two other prior occasions been convicted of a most serious offense in this or any other state. RCW 9.94A.030(38)(a). The Persistent Offender Accountability Act (POAA) states that a persistent offender shall be sentenced to life imprisonment without the possibility of release. RCW 9.94A.570. We review alleged constitutional violations de novo. *State v. Siers*, 174 Wn.2d 269, 273-74, 274 P.3d 358 (2012).

2.      The Trial Court Did Not Err

The Sentencing Reform Act of 1981 (SRA) requires the trial court to conduct a sentencing hearing. RCW 9.94A.500(1). "The trial court must decide by a preponderance of the evidence whether a defendant has a criminal history and specify the convictions it has found to exist." *State*

26

*v. Knippling*, 141 Wn. App. 50, 55, 168 P.3d 426 (2007), *aff'd*, 166 Wn.2d 93, 206 P.3d 332 (2009). "'Sentencing under the persistent offender section of the SRA raises two questions of fact, whether certain kinds of prior convictions exist and whether the defendant was the subject of those convictions.'" *Knippling*, 141 Wn. App. at 55-56 (quoting *State v. Lopez*, 107 Wn. App. 270, 278, 27 P.3d 237 (2001) (internal quotations omitted).

A defendant has a constitutional right to a trial by jury. U.S. CONST. amend VI; WASH. CONST. art. I, § 21. However, sentencing under the POAA does not violate a defendant's right to a jury trial or due process. *State v. Witherspoon*, 180 Wn.2d 875, 893-94, 329 P.3d 888 (2014).

Specifically, Reed relies on the U.S. Supreme Court decisions that state any fact that increases the penalty for a crime must be submitted to a jury. *Alleyne v. United States*, ___ U.S. ___, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013); *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000); *Almendarez–Torres v. United States*, 523 U.S. 224, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998).

Our Supreme Court recently considered the cases relied on by Reed and rejected this issue. *Witherspoon*, 180 Wn.2d at 894. In *State v. Langstead*, 155 Wn. App. 448, 453, 228 P.3d 799 (2010), we stated that "[b]ecause of the exception for 'the fact of a prior conviction,' there is no violation of the Sixth Amendment or the due process clause of the Fourteenth Amendment when a judge determines by a preponderance of the evidence that a defendant has two prior 'strikes' for purposes of the Persistent Offender Accountability Act." Therefore, we conclude that the trial court did not err by finding by a preponderance of the evidence that Reed had at least two prior most serious offenses that counted as strikes under the POAA.

D.        EQUAL PROTECTION—PERSISTENT OFFENDER SENTENCE

Reed argues that the trial court erred by classifying the persistent offender finding as an aggravator or sentencing factor instead of an element because it violated his right to equal protection. We disagree.

Under both the state and federal constitutions, persons similarly situated with respect to the legitimate purpose of the law must receive like treatment. U.S. CONST. amend. XIV; WASH. CONST. art. I, § 12. We review the legislative classification for a rational basis when the classification does not involve a suspect class or threaten a fundamental right. *State v. Manussier*, 129 Wn.2d 652, 673, 921 P.2d 473 (1996), *cert. denied*, 520 U.S. 1201 (1997).

We have rejected similar arguments. In *Langstead*, we held that there existed a rational basis to distinguish between prior convictions that are used to prove an element of a crime and prior convictions that are used to prove an aggravating factor for sentencing. 155 Wn. App. at 455-57. Therefore, we conclude that because a rational basis exists for the classification, the trial court did not violate Reed's equal protection rights, and his claim fails.

III.      COMMON ISSUES

A.        SUFFICIENCY OF THE EVIDENCE

Davis and Reed argue that insufficient evidence supports their convictions for both counts of assault because no evidence existed that the intruders intended to make Kelly or Devine apprehensive or fearful of bodily injury or that they were in fear. We conclude sufficient evidence exists to support both Davis's and Reed's convictions for both counts of assault. The same analysis applies to both defendants.[12]

---

[12] Although we may only discuss specific evidence in our analysis, we rely on the entire record in resolving this issue.

1.      Legal Principles

To determine whether sufficient evidence supports a conviction, we view the evidence in the light most favorable to the State and determine whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt. *State v. Engel*, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009). "'Substantial evidence' is evidence sufficient to persuade a fair-minded person of the truth of the asserted premise." *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014).

"In claiming insufficient evidence, the defendant necessarily admits the truth of the State's evidence and all reasonable inferences that can be drawn from it." *State v. Drum*, 168 Wn.2d 23, 35, 225 P.3d 237 (2010). Any inferences "'must be drawn in favor of the State and interpreted most strongly against the defendant.'" *Homan*, 181 Wn.2d at 106 (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). In addition, we "must defer to the trier of fact for purposes of resolving conflicting testimony and evaluating the persuasiveness of the evidence." *Homan*, 181 Wn.2d at 106.

Although the State argued that the jury could find Reed shot the gun, it also argued that the evidence showed both Davis and Reed acted as accomplices to the crime. To convict Davis and Reed of assault in the second degree, the State had to prove that each acted as a principal, or as an accomplice, and assaulted another with a deadly weapon. RCW 9A.36.021(1)(c).

To prove the assault under accomplice liability, the State had to prove that Davis and Reed "'must have known generally that he was facilitating an assault, even if only a simple, misdemeanor level assault, and need not have known that the principal was going to use deadly

29

force or that the principal was armed.'"[13] *State v. McChristian*, 158 Wn. App. 392, 401, 241 P.3d 468 (2010) (quoting *In re Pers. Restraint of Sarausad*, 109 Wn. App. 824, 836, 39 P.3d 308 (2001)). "In Washington, an accomplice need not be aware of the exact elements of the crime. As long as the defendant engaged in conduct that is 'the crime,' the defendant may be found guilty." *State v. Berube*, 150 Wn.2d 498, 508-09, 79 P.3d 1144 (2003) (internal citation omitted).

Washington recognizes three common law definitions of "assault": "(1) an attempt, with unlawful force, to inflict bodily injury upon another (attempted battery); (2) an unlawful touching with criminal intent (battery); and (3) putting another in apprehension of harm whether or not the actor intends to inflict or is capable of inflicting that harm (common law assault)." *State v. Winings*, 126 Wn. App. 75, 89, 107 P.3d 141 (2005). This case concerns the third definition.

"Assault by attempt to cause fear and apprehension of injury requires specific intent to create reasonable fear and apprehension of bodily injury." *State v. Eastmond*, 129 Wn.2d 497, 500, 919 P.2d 577 (1996) *overruled on other grounds by State v. Brown*, 147 Wn.2d 330, 58 P.3d 889 (2002). "A jury may infer specific intent to create fear from the defendant's pointing a gun at the victim, unless the victim knew the weapon was unloaded, but not from mere display." *Eastmond*, 129 Wn.2d at 500. Intent "'can be inferred as a logical probability from all the facts and circumstances.'" *State v. Yarbrough*, 151 Wn. App. 66, 87, 210 P.3d 1029 (2009) (quoting *State v. Wilson*, 125 Wn.2d 212, 217, 883 P.2d 320 (1994)).

---

[13] Neither Davis nor Reed challenges the sufficiency of the evidence supporting the firearm sentencing enhancement. For this sentence enhancement to apply to an unarmed accomplice, the accomplice must have had knowledge that his codefendant was armed. *State v. Hayes*, 182 Wn.2d 556, 564, 342 P.3d 1144 (2015).

### 2. Assault on Devine (Count III)

The record shows that Davis told Reed about the electronics in the motel room. Davis, Reed, and Daniel discussed and planned the crime. Reed and Davis retrieved the gun used in the crime from Reed's house. In addition, Daniel's testimony at trial proved that Davis knew of the gun because Daniel held the gun as he sat next to Davis in the car on the way to the motel and he handed the gun to Reed before entering the motel room. They brought the gun to intimidate Phily into giving them whatever he had. However, Davis stayed in the car.

Reed held the gun when he entered the motel room and he shot Phily. Devine watched Reed shoot Phily after they struggled with the gun. One of the men pointed the gun at her during the incident. Devine was shocked and scared. She worried one of the men would shoot her that night. The other man held another gun in McGlothlen's face.

When taken in the light most favorable to the State, the record as a whole shows that Reed pointed a gun at Devine, and she feared for her safety. In addition, Davis participated in the crime as an accomplice because he aided Reed in committing the crime by retrieving the gun and planning the crime, and he knew the crimes Reed intended to commit, a robbery and an assault by intimidating the occupants with a weapon. Therefore, we conclude that sufficient evidence exists to support both Davis's and Reed's convictions for assault in the second degree against Devine.

### 3. Assault on Kelly (Count V)

As previously stated, Davis planned the crime with Reed and Daniel. Davis and Reed retrieved the gun from Reed's house. They brought the gun to intimidate and scare Phily. Nearly immediately after one of the men opened the door to the motel room, Reed shot Phily. Kelly ran into the bathroom and crouched down because she feared for her safety. One of the men entered the bathroom holding a gun and asked Kelly where items were located. She feared for her safety

31

because she witnessed one of the men shoot Phily. Shortly thereafter, the man exited the bathroom. Kelly grabbed her belongings and ran out to her mother's house.

The evidence and its reasonable inferences, when taken in the light most favorable to the State, shows that one of the defendants asked Kelly where items were located while holding a gun, and Kelly feared for her safety. She displayed her fear by running away. In addition, Davis participated in the crime as an accomplice. He aided the other men in committing the crime by retrieving the gun and planning the crime, and he knew the crimes they intended to commit, a robbery through intimidation of the occupants with a weapon, or an assault. Therefore, we conclude that sufficient evidence exists to support both Davis's and Reed's convictions for assault in the second degree against Kelly.

B. PROSECUTORIAL MISCONDUCT

Davis argues that the prosecutor committed misconduct in closing argument because he twice misstated the law, he misused the puzzle analogy to explain reasonable doubt, and he impugned defense counsel. Davis also argues that the repetitive misconduct of the prosecutor denied him a fair trial. Reed adopts Davis's arguments that the prosecutor committed misconduct. We conclude that the prosecutor did not commit misconduct.

1. Standard of Review

"Prosecutorial misconduct may deprive a defendant of his constitutional right to a fair trial. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012). An appellant claiming prosecutorial misconduct must demonstrate that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 759-61, 278 P.3d 653 (2012). To establish prejudice, the appellant must then show that the improper comments had a substantial likelihood of affecting the verdict. *Emery*, 174 Wn.2d at 760.

32

But when the defendant failed to object to the improper comments at trial, the defendant must also show that the comments were "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Emery*, 174 Wn.2d at 760-61. The appellant must show that (1) no curative instruction would have eliminated the prejudicial effect, and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the verdict. *Emery*, 174 Wn.2d at 761. The focus of this inquiry is more on whether the resulting prejudice could have been cured, rather than the flagrant or ill-intentioned nature of the remarks. *Emery*, 174 Wn.2d at 761-62.

2.      Misstating the Law

Davis and Reed argue that in closing argument the prosecutor misstated the law on the robbery charge and the two counts of assault. Reed objected to the statement relating to the robbery, but Davis did not. Neither Davis nor Reed objected to the argument on the assaults.

"A prosecuting attorney commits misconduct by misstating the law." *State v. Allen*, 182 Wn.2d 364, 373, 341 P.3d 268 (2015). Yet, the improper statements must also be prejudicial. *Allen*, 182 Wn.2d at 375.

a.      Robbery

We address Davis's and Reed's argument that the prosecutor misstated the law by stating, "If they were party to a robbery, their guilt as to each of these offenses flows naturally." 13 RP at 1787. Davis and Reed argue the prosecutor misstated the law because the statement implied that if the jury found one of the defendants guilty of murder in the first degree because he participated in the robbery, then he was also guilty of all of the other charges. Br. of Appellant Davis at 34.

To convict Davis or Reed of any of the crimes as an accomplice, the jury must have found that he,

> with knowledge that it will promote or facilitate the commission of the crime, . . . either:

33

> (1) solicits, commands, encourages, or requests another person to commit the crime; or
> (2) aids or agrees to aid another person in planning or committing the crime.
> The word 'aid' means all assistance whether given by words, acts, encouragement, support, or presence. A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.

CP (Davis) at 279 (Instr. 19).

Here, the prosecutor referred to incident or crimes committed as "the robbery" throughout his argument. The prosecutor seemed to try to focus the jury on the robbery first, because the basis of either defendant's conviction as an accomplice relied on whether he was a party to the robbery. As stated in the definition for accomplice liability, Davis or Reed must have solicited, encouraged, or aided Daniel in the crimes. After the trial court overruled the objection to the challenged statement, the prosecutor argued that "the central issue here is whether or not these people were involved in a robbery . . . it is not about who the shooter was." 13 RP at 1788. The prosecutor did not misstate the law because he made a factual argument about the accomplice charges. The prosecutor argued that if either defendant acted as an accomplice in the robbery, he was also responsible for the crimes that occurred as part of the robbery and the murder that occurred during the robbery. If the jury found a defendant guilty of the robbery, based on the facts, the defendant would also be guilty of the other charges based on what occurred during the robbery.

Regardless, Davis and Reed are unable to show prejudice here under either standard. Because Reed objected to the statement, he must show that the improper comments had a substantial likelihood of affecting the verdict. *Emery*, 174 Wn.2d at 759-61. Reed failed to show that there was a substantial likelihood that the comment affected the verdict. Because Davis did not object to the statement, he must show that the statement was "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Emery*, 174 Wn.2d at 760-61. Davis fails to meet this burden.

The trial court properly instructed the jury on accomplice liability and what was required to convict either defendant as an accomplice on each crime. *Emery*, 174 Wn.2d at 759-61. We presume the jury follows the trial court's instructions. *Anderson*, 153 Wn. App. at 428. Further, the jury was instructed that it "must separately decide each count charged against each defendant. Your verdict on one count as to one defendant should not control your verdict on any other count." CP (Davis) at 273 (Instr. 13). Even if the jury misunderstood the prosecutor's argument that if it found one defendant committed the robbery, the court instructed that the jury needed to consider the other defendant's actions separately. In addition, Reed's counsel responded directly to this statement in her closing argument and argued that the jury must consider each defendant and each count separately. Accordingly, we conclude that the prosecutor did not commit misconduct by this statement.

### b. Assaults

Next, we address whether the prosecutor misstated the law twice when he first argued that Kelly and Devine were victims of assault because they witnessed the intruders shoot Phily, and second, in rebuttal, when he argued that "the act that they did that makes them responsible [for the assaults] . . . it's barging into the room." 13 RP at 1889. Because neither of these statements was objected to, Davis and Reed must show that the comments were "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Emery*, 174 Wn.2d at 760-61.

To determine whether the prosecutor misstated the law, we consider *State v. Asaeli*, 150 Wn. App. 543, 208 P.3d 1136 (2009), and review whether someone may be a victim of assault if he or she witnessed someone else being shot. In *Asaeli*, the defendant intentionally shot into a car containing multiple people, multiple times. 150 Wn. App. at 582. The court determined that "[a]t

35

the very least, this was an act done with the intent to create in another apprehension and fear of bodily injury." *Asaeli*, 150 Wn. App. at 582. Because the victim of the charged assault's testimony

> established that she saw at least two of the bullets come through the car's windshield and that she lay down in the back seat after Asaeli started shooting. [The court determined that a]lthough [the victim] did not testify that she was afraid she would be shot and injured, the fact she was aware of the gunfire and took the only cover she could creates a very strong inference that the shooting created an apprehension and imminent fear of bodily injury.

*Asaeli*, 150 Wn. App. at 582. Accordingly, the court determined that the evidence that the defendant committed an assault against the victim was strong. *Asaeli*, 150 Wn. App. at 582.

> Here, the prosecutor's statement was followed by:

> That is an act, barging into a room. They are there. They are guests. This is a happy place. It's supposed to be a happy place, and two men, uninvited, forced their way in. That's an act, and then one of those men has a gun, and then one of those men shoots [Phily]. . . . What's the act they did? That's the act. The act of invading that space, one of them armed with a gun, one of them shooting [Phily].

13 RP at 1889. In context, the statement focuses on the fact that both Kelly and Devine similarly witnessed a shooting at close range in the motel room. Based on *Asaeli*, there would be sufficient evidence for an inference that the shooting created an apprehension and imminent fear of bodily injury. The defendants barging into the room did not establish facts that support an inference of apprehension and fear of bodily injury, it was the shooting. Accordingly, we conclude that the prosecutor did not misstate the law.

Regardless, Davis and Reed again fail to prove that the statement prejudiced them because the statement was not so flagrant and ill-intentioned that no curative instruction would have eliminated any prejudicial effect of the statement. Again, we presume the jury follows the trial court's instructions. *Anderson*, 153 Wn. App. at 428. The court instructed the jury on the elements of assault, and from the jury instructions it was clear what the State needed to prove. Davis and Reed fail to meet their burden of proving that the comment was so flagrant and ill-intentioned that

36

a curative instruction could not have cured it. Therefore, we conclude that the prosecutor did not commit misconduct in closing argument by misstating the law.[14]

### 3. Puzzle Analogy

Next we address the prosecutor's puzzle analogy. Davis and Reed both objected to this argument, and thus, they must demonstrate that the comments were improper and had a substantial likelihood of affecting the verdict. *Emery*, 174 Wn.2d at 759-61.

Several cases have addressed the "puzzle analogy." *State v. Lindsay*, 180 Wn.2d 423, 436, 326 P.3d 125, 131 (2014); *State v. Fuller*, 169 Wn. App. 797, 825-27, 282 P.3d 126 (2012), *review denied*, 176 Wn.2d 1006, 297 P.3d 68 (2013); *State v. Curtiss*, 161 Wn. App. 673, 700, 250 P.3d 496 (2011); *State v. Johnson*, 158 Wn. App. 677, 685, 243 P.3d 936 (2010).

In *Johnson*, the court held that "the prosecutor's arguments discussing the reasonable doubt standard in the context of making an affirmative decision based on a partially completed puzzle trivialized the State's burden, focused on the degree of certainty the jurors needed to act, and implied that the jury had a duty to convict without a reason not to do so." 158 Wn. App. at 685. Accordingly, the court found the statement was improper and prejudicial. *Johnson*, 158 Wn. App. at 685-86.

The court in *Curtiss* held that a similar puzzle analogy was proper. 161 Wn. App. at 700-01. There, the prosecutor stated, "There will come a time when you're putting that puzzle together, and even with pieces missing, you'll be able to say, with some certainty, beyond a reasonable doubt what that puzzle is: The Tacoma Dome." *Curtiss*, 161 Wn. App. at 700.

---

[14] Davis also argues that he received ineffective assistance of counsel because his attorney failed to object to the prosecutor's misstatement of the law. Because we conclude that the prosecutor did not misstate the law, the proposed objection would not have been sustained, and thus, the argument fails. *See In re Pers. Restraint of Davis*, 152 Wn.2d 647, 714, 101 P.3d 1 (2004).

The *Fuller* court explained the difference between *Johnson* and *Curtiss*. 169 Wn. App. at 825-28. The key difference was that the "quantification by the prosecutor of the number of pieces and percentage of completion required for reasonable doubt in *Johnson* was entirely different from the prosecutor's general reference to being able to discern the subject of a puzzle with some pieces missing in *Curtiss*." *Lindsay*, 180 Wn.2d at 435. "The former statement introduced elements of specific quantification into the reasonable doubt analysis, while the latter did not." *Lindsay*, 180 Wn.2d at 435.

The *Lindsay* court held that its case was plainly analogous to *Johnson* because the prosecutor stated, "You could have 50 percent of those puzzle pieces missing and you know it's Seattle," quantifying the standard of proof. 180 Wn.2d at 436.

Here, the prosecutor's statements are analogous to the comments in *Curtiss* or *Fuller* because he did not make a reference to what percent of the puzzle would need to be complete to constitute reasonable doubt. The prosecutor merely suggested that at a certain point, even with missing pieces, the jury could be certain of the puzzle's image beyond a reasonable doubt. In addition, the portion of the prosecutor's argument that discussed being on a ferry boat did not trivialize the burden for sitting as a juror in a murder trial. Therefore, we conclude that the prosecutor did not commit misconduct when he argued the puzzle analogy because the statement was not improper.

### 4. Impugning Defense Counsel

Finally, we address whether the prosecutor's comments impugned defense counsel. Only Reed objected to this statement, and thus, Davis must demonstrate the comments were "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Emery*, 174

Wn.2d at 760-61. Reed must show that the comments had a substantial likelihood of affecting the verdict. *Emery*, 174 Wn.2d at 761.

"[A] prosecutor must not impugn the role or integrity of defense counsel. Prosecutorial statements that malign defense counsel can severely damage an accused's opportunity to present his or her case and are therefore impermissible." *Lindsay*, 180 Wn.2d at 431-32 (internal citation omitted).

In cases where courts have found that the prosecutor impugned defense counsel, the prosecutor made much more egregious statements than the challenged statements here.

> In [*State v.*] *Negrete*, for example, the prosecutor said that defense counsel was "'being paid to twist the words of the witnesses.'" 72 Wn. App. [62,] 66, 863 P.2d 137 [1993]. In *State v. Gonzales*, the prosecutor impermissibly contrasted the roles of prosecutor and defense counsel, stating that while the defense attorney's duty was to his criminal client, the prosecutor's duty was "'to see that justice is served.'" 111 Wn. App. 276, 283, 45 P.3d 205 (2002). And in *Bruno* [*v. Rushen*], "the obvious import of the prosecutor's comments was that *all* defense counsel in criminal cases are retained solely to lie and distort the facts and camouflage the truth." 721 F.2d [1193,] 1194 [1983].

*Lindsay*, 180 Wn.2d at 433. In *Lindsay*, the court found that one statement by the prosecutor did impugn defense counsel: "This is a crock. What you've been pitched for the last four hours is a crock." 180 Wn.2d at 433. The *Lindsay* court analogized the statement to a similar statement found to impugn the defense counsel in *State v. Thorgerson*, 172 Wn.2d 438, 451-52, 258 P.3d 43 (2011): the prosecutor referred to defense counsel's presentation of his case as "'bogus'" and involving "'sleight of hand.'" 180 Wn.2d at 433.

Here, the prosecutor stated, "And everyone is entitled to vigorous representation and an advocate that will fight for you, but don't confuse vigorous advocacy with there being any merit to what [defense counsel] said to you during their comments." 13 RP at 1878. The statement was not improper and did not impugn defense counsel.

### 5.      Repetitive Misconduct

Davis argues that the repetitive misconduct of the prosecutor denied him a fair trial. "Repetitive misconduct can have a 'cumulative effect.'" *Allen*, 182 Wn.2d at 376 (quoting *Glasmann*, 175 Wn.2d at 707) (internal quotations omitted). Although repetitive misconduct can have a cumulative effect, here it did not. Because of our conclusions regarding prosecutorial misconduct, there exists no repetitive misconduct. Accordingly, we conclude that Davis was not denied a fair trial.

### C.      PRIOR CONSISTENT STATEMENT[15]

Davis argues and Reed asserts that the trial court abused its discretion by admitting Daniel's prior consistent statement because the trial court did not consider whether he was unlikely to have foreseen the legal consequences of his statement when he made it.[16] Davis also argues that the recording of Daniel's statement was irrelevant and prejudicial. We disagree.

### 1.      Standard of Review

We review a trial court's decision to exclude or admit evidence under an abuse of discretion standard. *State v. Thomas*, 150 Wn.2d 821, 856, 83 P.3d 970 (2004). "A trial court's decision will be reversed only if no reasonable person would have decided the matter as the trial court did." *Thomas*, 150 Wn.2d at 856. "Proper objection must be made at trial to perceived errors in

---

[15] In his SAG, Reed joins and adopts Davis's argument that the trial court its discretion by admitting evidence as a prior consistent statement based on its erroneous view of the law.

[16] Davis also argues that the trial court abused its discretion because it did not review the transcript of the statement in its entirety before admitting the recording. He is incorrect. The trial court found that the redacted interview did not include direct reference to Reed, and the statements did not violate the confrontation clause. Regardless, Davis does not assign error to specific portions of the statement. An appellant must provide this court with references to relevant parts of the record to support its argument. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992); RAP 10.3(a)(6). Accordingly, we do not address this portion of Davis's argument.

admitting or excluding evidence and failure to do so precludes raising the issue on appeal." *Thomas*, 150 Wn.2d at 856; RAP 2.5(a). "If the trial court based its evidentiary ruling on an incomplete legal analysis or a misapprehension of legal issues, the ruling may be an abuse of discretion." *State v. McComas*, 186 Wn. App. 307, 312, 345 P.3d 36, *review denied*, 184 Wn.2d 1008 (2015).

2. The Trial Court Did Not Abuse Its Discretion

a. Relevance

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Relevant evidence is generally admissible. ER 402. "The threshold to admit relevant evidence is very low. Even minimally relevant evidence is admissible." *State v. Darden*, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002). Yet, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." ER 403.

Here, Daniel's prior consistent statement was relevant because Daniel was a co-defendant who testified about the crimes and both defendants' involvement. Although he provided inconsistent statements about Reed threatening him and his motivation for the crime, his other statements were consistent. The statement was relevant to rebut the implied charge by the defendants that he changed his testimony for the plea agreement. Because the majority of his statement to police was consistent with his trial testimony, it was relevant. The trial court did not abuse its discretion by admitting the evidence on relevancy grounds.

41

b.     Rebutting Improper Motive

ER 801(d)(1) provides that a statement is not hearsay if:

> The declarant testifies at the trial or hearing and is subject to cross[-]examination concerning the statement, and the statement is . . . (ii) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.

If cross-examination raises an inference "that the witness changed [his] story in response to an external pressure, then whether that witness gave the same account of the story prior to the onset of the external pressure becomes highly probative of the veracity of the witness's story given while testifying." *Thomas*, 150 Wn.2d at 865. "Cross-examination designed to show that the witness has the motive to change his story to receive a plea agreement triggers ER 801(d)(1)(ii)." *State v. McWilliams*, 177 Wn. App. 139, 148, 311 P.3d 584 (2013).

Here, both Davis and Reed implied that Daniel fabricated his testimony to receive the benefits of his plea bargain. The trial court concluded that both defendants highlighted and emphasized Daniel's reduced sentence to imply that the core of Daniel's testimony could not be believed because of the plea agreement.

However, "'[t]he mere assertion that motives to lie may have existed at the time of the prior statement is insufficient to prevent their admission.'" *McWilliams*, 177 Wn. App. at 149 (quoting *State v. Makela*, 66 Wn. App. 164, 173, 831 P.2d 1109 (1992)). Accordingly, as a threshold matter, the trial court must determine "whether the proffered motive [to lie] rises to the level necessary to exclude the prior consistent statement." *Makela*, 66 Wn. App. at 173. "To do so, the trial court considers whether the witness made the prior consistent statements when 'the witness was unlikely to have foreseen the legal consequences of his or her statements.'" *McWilliams*, 177 Wn. App. at 149 (quoting *Makela*, 66 Wn. App. at 169).

The trial court concluded that Daniel was unlikely to have foreseen the legal consequences of his statement when he provided it to the police. The trial court considered that Daniel entered into a plea agreement long after he made the prior consistent statement to law enforcement. Daniel testified that he learned after a year and a half of being in jail that he could reach an agreement with the State. All of the parties agreed on this issue. Accordingly, the trial court utilized the proper test for admission and did not abuse its discretion in admitting the prior consistent statement. Therefore, we conclude that because the trial court did not make a decision that no reasonable person would have made, it did not abuse its discretion.

D.  CUMULATIVE ERROR

Davis argues that reversal is required because cumulative error denied his right to a fair trial. Reed also argues that reversal is required because cumulative error denied his right to a fair trial. We disagree.

The cumulative error doctrine applies only in circumstances where there were several trial errors that standing alone may not be sufficient to justify reversal, but viewed together may deny the defendant a fair trial. *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). Where no prejudicial error is shown to have occurred, cumulative error cannot be said to have deprived the defendant of a fair trial. *State v. Stevens*, 58 Wn. App. 478, 498, 794 P.2d 38 (1990).

None of Davis's claimed errors undermined his right to a fair trial or the validity of his convictions because there was no error. In addition, none of Reed's claimed errors undermined his right to a fair trial or the validity of his convictions because the only error was harmless. Accordingly, we hold that both Davis's and Reed's claims of cumulative error fail.

E.    APPELLATE COSTS

Reed opposes appellate costs in light of *State v. Sinclair*, 192 Wn. App. 380, 367 P.3d 612, *review denied*, 185 Wn.2d 1034 (2016), asserting that he does not have the ability to pay. For the first time in his reply brief, Davis asks us to exercise our discretion and not award costs to the State. He filed a motion on this issue, and asks us to consider the motion as a supplement to his opening brief.

If the State decides to file a cost bill and if Reed and Davis each object to that cost bill, a commissioner of this court will consider whether to award appellate costs pursuant to RAP 14.2.

STATEMENT OF ADDITIONAL GROUNDS—DAVIS

Davis asserts that the prosecutor ignored exculpatory evidence and statements and "bullied" the jury into a guilty verdict. SAG (Davis) at 1. He also asserts that the trial was biased. However, Davis does not identify any clear error, he simply states these assertions as facts.

In addition, Davis asserts that his attorney withdrew because Davis refused to take plea deal. Davis again does not identify any clear error. This assertion pertains to matters outside the record. On direct appeal, we cannot consider matters outside the record. *Curtiss*, 161 Wn. App. at 703 (citing *State v. McFarland*, 127 Wn.2d 322, 338 n.5, 899 P.2d 1251 (1995) ("a personal restraint petition is the appropriate means of having the reviewing court consider matters outside the record")). Although RAP 10.10 does not require an appellant to refer to the record or cite authority, he is required to inform us of the "nature and occurrence of the alleged errors." RAP 10.10(c). Davis's assertions of error are too vague to allow us to identify the issues and we do not reach them.

Davis also asserts that he did not receive a copy of his discovery. However, Davis actually admits in the same sentence that he did receive a copy of his discovery, but it was only a week

before trial. Furthermore, this argument pertains to matters outside the record, and he also concedes the issue. Therefore, we do not reach the issue.

STATEMENT OF ADDITIONAL GROUNDS—REED

Reed asserts that he received ineffective assistance of counsel because he was denied confidentiality in his conversations with his attorney. However, nothing in the record shows that his attorney's performance was deficient based on the concern about the strength of the victim's mother's hearing aid. As previously stated, although RAP 10.10 does not require an appellant to refer to the record or cite authority, he is required to inform us of the "nature and occurrence of the alleged errors." RAP 10.10(c). Reed's assertion of error is too vague to allow us to identify the issues and thus, we do not reach them.

In addition, Reed asserts that the victim's mother could hear him speaking with his attorney during trial with her listening device and shared the content of the conversations with the prosecution. This claim pertains to matters outside the record.

During trial, the trial court informed the parties that the victim's mother was using a hearing device that could pick up conversations in the courtroom. The trial court asked the parties to inform the court if they wanted the device silenced for some reason. After Reed's attorney expressed concern about her ability to speak to Reed, the trial court responded:

> it can pick up conversations that otherwise a normal hearing person would not be able to given the distance, so what I'm suggesting to the both of you, both to you and [Davis's attorney] is that you be circumspect in those conversations, do them in writing or whatever, if there needs to be something of importance said, you merely need to report the Court. If it takes that we have to take a break so you can have a conversation with your client, then I will do so.

2 RP at 243. Reed's attorney stated on the record that she did not feel she was able to communicate freely with Reed because of her concern that the victim's mother overheard their conversation. In response, the trial court reiterated that they communicate in writing or ask for a brief break for a

conversation, and the court would turn off the device.[17]  The State stated that it expressed to the victim's mother the importance of that counsel be able to confer with their clients in confidence and to alert the court if she began to hear such communications.

Nothing in the record clearly reflects that the victim's mother heard the conversations or communicated anything to the State.  Again, on direct appeal, we cannot consider matters outside the record and a personal restrain petition is the appropriate means for this issue.  *McFarland*, 127 Wn.2d at 338 n.5.  Therefore, we do not consider this issue.

I.      SUFFICIENCY OF THE EVIDENCE

Reed seems to assert that his conviction should be reversed because insufficient evidence supports a conviction of murder in the first degree because he was an accomplice and should only have been on trial for a charge of murder in the second degree.  Because Daniel, Reed's co-defendant, was the shooter but only convicted of murder in the second degree, Reed asserts that he should also have been convicted of murder in the second degree as an accomplice.

RCW 9A.32.030(1) provides that "A person is guilty of murder in the first degree when: . . . (c) He or she commits or attempts to commit the crime of . . . (3) burglary in the first degree, . . . and in the course of or in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants."

Reed does not challenge his conviction of burglary in the first degree.  Reed also does not challenge that Phily died during the course of the robbery.  Therefore, sufficient evidence supports his conviction of murder in the first degree because he committed one of the enumerated felonies and a death of someone other than a participant resulted in the course of the crime.

---

[17] The trial court specifically noted that it was "not making a finding that Ms. Phily can overhear anything at all."  2 RP at 246-47.

II.   ISSUES ADDRESSED IN REED'S DIRECT APPEAL

In his SAG, Reed joins and adopts Davis's argument that the trial court abused its discretion by admitting Daniel's statement as a prior consistent statement based on its erroneous view of the law. For the same reasons explained in Section III C above, we hold that the trial court did not err by admitting Davis's statement.

Reed also requested to add to his appellate attorney's argument in his appeal that the trial court violated his right to confrontation by denying his motion to sever because the redaction of Davis's statement was insufficient. For the same reasons explained in Section II A above, we hold that the trial court erred, but the error was harmless.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____

Melnick, J.

We concur:

_____

Bjorgen, C.J.

_____

Lee, J.